# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 10, 2022       Decided June 27, 2023

No. 22-5074

ITSERVE ALLIANCE, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03855)

---

*Geoffrey Forney* argued the cause and filed the briefs for appellant.

*Joshua S. Press*, Senior Litigation Counsel, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Colin A. Kisor*, Deputy Director, and *Glenn M. Girdharry*, Assistant Director.

*John M. Miano* was on the brief for *amicus curiae* Immigration Reform Law Institute and U.S. Tech Workers in support of appellee.

Before: KATSAS and PAN, *Circuit Judges*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  The H-1B visa program allows foreign nationals to work in the United States in specialized positions for sponsoring employers.  By regulation, any such employer must file amended paperwork with the United States Citizenship and Immigration Services whenever it makes a "material change" in the terms of covered employment.  In *Simeio Solutions, LLC*, 26 I & N Dec. 542 (AAO 2015), USCIS interpreted that phrase to include a change in the place of employment.  And in an ensuing guidance document, USCIS memorialized this interpretation and exercised discretion to limit its retroactive enforcement.

ITServe Alliance, Inc., a trade association representing employers, seeks a declaratory judgment that *Simeio* and the guidance document are unlawful.  ITServe contends that *Simeio* was a procedurally defective rulemaking and that USCIS lacks statutory authority to require the amended filings.  We hold that ITServe has Article III standing to raise these arguments, but we reject them on the merits.

I

A

The Immigration and Nationality Act sets forth conditions for foreign nationals to receive visas allowing entry into the United States.  8 U.S.C. § 1201(a)(1).  An H-1B visa allows an alien to work for a sponsoring employer in a specialty occupation, *id.* § 1101(a)(15)(H)(i)(b), which is one that requires at least a bachelor's degree, or its equivalent, in the specific specialty, *id.* § 1184(i)(1)(B).

Before an alien can obtain an H-1B visa, the sponsoring employer must file a Labor Condition Application (LCA) with the Department of Labor. 8 U.S.C. § 1182(n)(1). The application must specify job details such as the proposed occupation, place of employment, and wage rate. *Id.* § 1182(n)(1)(A), (D). The employer must promise to pay the higher of either (I) the actual wage that it pays to similarly skilled employees or (II) the prevailing wage for such employees in the local area. *Id.* § 1182(n)(1)(A)(i). Unless the application is "incomplete or obviously inaccurate," Labor must approve it within seven days. *Id.* § 1182(n)(1)(G)(ii).

The employer then must petition USCIS to classify its prospective employee as eligible for an H-1B visa. 8 U.S.C. § 1184(c)(1).[1] The petition "shall be determined by" USCIS, "after consultation" with the Department of Labor. *Id.* The petition "shall be in such form and contain such information" as USCIS "shall prescribe." *Id.* Under this authority, USCIS requires the employer to submit an approved LCA and promise to comply with its terms. 8 C.F.R. § 214.2(h)(4)(iii)(B). If USCIS approves the petition, the alien becomes eligible to receive a visa to work for the sponsoring employer in the approved job for up to six years. 8 U.S.C. § 1184(g)(4).

In some circumstances, sponsoring employers must update these various filings. Labor regulations require a new LCA when the employer moves an H-1B employee to a new place of employment. 20 C.F.R. § 655.730(c)(5). An immigration regulation requires a new or amended H-1B petition as needed "to reflect any material changes in the terms and conditions of employment … or the alien's eligibility as specified in the

---

[1] Section 1184(c)(1) references the Attorney General, but the Homeland Security Act transferred the authority for adjudicating these petitions to the Bureau of Citizenship and Immigration Services, which is now known as USCIS. *See* 6 U.S.C. § 271(b)(5).

original approved petition." 8 C.F.R. § 214.2(h)(2)(i)(E). The latter provision, which we call the "material change regulation," is the focus of this case.

B

In *Simeio Solutions, LLC*, 26 I & N Dec. 542 (AAO 2015), USCIS interpreted the material change regulation to require the sponsoring employer to file a new or amended H-1B petition whenever a change in the place of employment necessitates the filing of a new LCA.

The dispute in *Simeio* arose when an employee sought an H-1B visa based on an approved petition that designated Long Beach, California as the place of employment. 26 I & N Dec. at 543. When the consular office sought to confirm the employment details, Simeio responded with information that did not match the petition. The consular office returned the petition to USCIS for review. USCIS then discovered that the employer had abandoned its Long Beach office, so it issued a notice of intent to revoke the petition. *Id.* at 543–44. In response, the employer submitted to the Department of Labor a new LCA specifying other worksites, but it neglected to submit an amended H-1B petition to USCIS. *Id.* at 544. A USCIS field office therefore revoked the employer's petition.

The Administrative Appeals Office of USCIS affirmed the revocation. It reasoned that because employers must pay H-1B workers at least the prevailing wage for similar employees "in the area of employment," 8 U.S.C. §1182(n)(1)(A)(i)(II), a geographic move could affect eligibility for H-1B status, and so the move was a "material" change in the terms of employment. 26 I & N Dec. at 547–48. The Department of Homeland Security, USCIS's parent agency, designated this decision as precedential, which made it binding within USCIS.

5

A few months after *Simeio* was decided, USCIS issued a guidance document describing its holding and outlining how the agency would implement it in other cases. Policy Memorandum No. 602-0120, Final Guidance on When to File an Amended or New H-1B Petition After *Matter of Simeio Solutions, LLC* (July 21, 2015), App. 71. Among other things, the guidance document explained that USCIS would not seek to revoke H-1B petitions based on workplace moves that happened before *Simeio* was decided. *Id.* at 74.

C

ITServe is a trade association representing companies that provide information-technology services to clients. In this lawsuit, ITServe sought a declaratory judgment that *Simeio* and the ensuing guidance document are unlawful. ITServe contends that *Simeio* was a procedurally defective rulemaking and that USCIS lacks statutory authority to require updated petitions whenever a sponsoring employer moves an H-1B worker to a different worksite. The district court held that ITServe had Article III standing but granted summary judgment to the agency. *ITServe All., Inc. v. DHS*, 590 F. Supp. 3d 27 (D.D.C. 2022).

II

We begin, as we must, with standing. Article III of the Constitution limits the federal judicial power to resolving "Cases" or "Controversies." U.S. Const. art. III § 2, cl. 1. Standing doctrine implements this case-or-controversy requirement. *Allen v. Wright*, 468 U.S. 737, 750–51 (1984).

ITServe claims representational standing as a voluntary membership organization. It must show that (1) at least one of its members would have standing to sue; (2) the lawsuit seeks to protect interests germane to its purposes; and (3) neither the

claim nor the requested relief requires individual members to join. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). There is no dispute about the last two elements: This lawsuit seeks to make it easier for employers to move H-1B workers from one location to another, which is germane to ITServe's purpose as a trade association representing the interests of employers who regularly hire such workers. And there is no reason why individual employers must join the suit for us to fairly decide the legal issues presented. The only contestable standing question is whether a member of ITServe could bring this lawsuit individually.

To establish Article III standing, an individual entity must show that it has suffered, or will imminently suffer, an injury caused by the challenged conduct and likely to be redressed by a favorable judicial decision. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). ITServe adequately proved that Saxon Global, Inc., an information-technology company that is one of its members, would have standing. Saxon submitted a declaration that it "regularly employs foreign nationals in H-1B status" to provide on-site service to clients. App. 6. These employees work under client contracts "of a defined duration," after which Saxon assigns them to new projects for different clients. *Id.* Often, the new projects are at client sites outside the areas specified in the initial LCA and H-1B petition. *Id. Simeio*'s interpretation of the material change regulation thus requires Saxon to file amended H-1B petitions whenever it relocates H-1B employees. *Id.* at 8. And each filing requires Saxon to incur substantial filing and attorney fees. *Id.* at 7; 8 C.F.R. § 106.2(a)(3)(i). This is a classic pocketbook injury traceable to *Simeio* and redressable by a favorable decision from this Court.

DHS objects that Saxon did not adequately spell out the details of specific employee movements. DHS invokes a statement in *Lujan* that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be" do not establish a sufficiently imminent injury. 504 U.S. at 564. But the possibility that Saxon will have to transfer H-1B employees to new locations is hardly as speculative as the *Lujan* plaintiffs' stated intentions to travel across the world to view endangered species. The very nature of Saxon's business involves frequently transferring H-1B employees, triggering a steady and ongoing obligation to file amended H-1B petitions. And Saxon did estimate that *Simeio* forces it to amend some twenty H-1B petitions per year. App. 8. DHS objects that the estimate was made as of 2021, whereas standing must be assessed as of when the lawsuit was filed in 2020. *See Lujan*, 504 U.S. at 570 n.4. But no record evidence suggests that Saxon's business practices changed over that one year, so the estimate fairly shows what Saxon faced when the lawsuit was filed.

More broadly, DHS contends that a party may never establish an Article III injury from the precedential effect of an administrative adjudication to which it was not a party. *Teva Pharmaceuticals USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010), definitively rebuts that contention. In *Teva*, we held that a drug manufacturer had standing to challenge an unfavorable statutory interpretation adopted in administrative adjudications to which the manufacturer was not a party. We exhaustively surveyed this Court's precedents on when non-parties have standing to challenge administrative adjudications. We acknowledged one line of cases stating that an adjudication's "mere precedential effect within an agency is not, alone, enough to create Article III standing, no matter how foreseeable future litigation." *Id.* at 1312 (quoting *Sea-Land Serv. v. DOT*, 137 F.3d 640, 648 (D.C. Cir. 1998)). But we

explained why the form of agency action threatening future injury cannot be dispositive:

> For the purpose of the classic constitutional standing analysis, it makes no difference to the "injury" inquiry whether the agency adopted the policy at issue in an adjudication, a rulemaking, a guidance document, or indeed by ouija board; provided the projected sequence of events is sufficiently certain, the prospective *injury* flows from what the agency is going to do, not how it decided to do it.

*Id.* We thus concluded that the cases following *Sea-Land* are "more naturally understood as arising from the lack of a sufficiently imminent and concrete injury than from some sort of ad hoc exception to otherwise-universally applicable constitutional doctrine." *Id.* at 1313. In contrast, we summarized four other decisions in which we allowed challenges to policies or interpretations adopted in administrative adjudications to which the challenger was not a party. *See id.* at 1314. In these cases, we explained, the challengers had standing because "the prospect of impending harm *was* effectively certain." *Id.*

DHS counters with *Conference Group, LLC v. FCC*, 720 F.3d 957 (D.C. Cir. 2013), but it bears little resemblance to this case. There, the Federal Communications Commission decided that one company provided telecommunications services under the governing statute and thus required the company to contribute to a certain FCC fund. *Id.* at 961. We held that another company, Conference Group, had standing to challenge this action as a procedurally defective rulemaking because, if the action were a broadly applicable rule, then Conference Group would likely have to contribute to the same fund. *Id.* at 962–63. But if the agency action was an

adjudication, we further held, then Conference Group would lack standing to challenge the substance of the action. On that point, we reiterated that the mere precedential effect of an agency adjudication does not permit a bystander to challenge it. *Id.* at 963. And we stressed that Conference Group did not "identify any imminent Commission enforcement action against it." *Id.* at 964. Here, in contrast, ITServe showed that Saxon's regular business practices would require it either to file amended petitions or risk revocation under *Simeio*. To be sure, agencies do not always enforce their statutes, rules, or decisions, and the lack of any credible enforcement threat may foreclose the possibility of an imminent injury. *See*, *e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2114 (2021). But here, the guidance document makes clear that USCIS will enforce *Simeio* with respect to employee relocations that happened or will happen after its issuance. App. 73–76. We thus have every reason to conclude that Saxon will fall within *Simeio*, which USCIS will enforce. That is enough to establish an imminent injury for purposes of Article III.

## III

ITServe contends that *Simeio* was a rulemaking disguised as an adjudication, which would make it procedurally invalid for lack of notice-and-comment procedures. We hold that *Simeio* was an adjudication.

The Administrative Procedure Act divides agency action into two broad categories, rulemaking and adjudication. Rulemaking is agency process for formulating a "rule," 5 U.S.C. § 551(5), which is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). Adjudication is agency process for formulating an "order," *id.*

§ 551(7), which is a "final disposition" in a "matter other than rule making but including licensing," *id.* § 551(6).

Building on these definitions, we have identified two principal distinctions between rulemaking and adjudication. First, rulemaking typically announces "generally applicable" legal principles, whereas adjudication involves case-specific determinations. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–33 (D.C. Cir. 2017). Second, rulemaking governs only the future, whereas adjudications "immediately bind parties by retroactively applying law to their past actions." *Id.* at 333; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J., concurring) ("rules have legal consequences only for the future").

Under these standards, *Simeio* was an adjudication. It arose out of a specific controversy involving an employer that changed an H-1B employee's intended worksites without filing an amended petition. 26 I & N Dec. at 543–44. It interpreted pre-existing law—*i.e.*, the material change regulation—to require an amended petition in those circumstances. *Id.* at 548. And it applied that law to revoke approval of the employer's H-1B petition. *Id.* at 549. *Simeio* thus reads and functions like a judicial decision interpreting an agency regulation and then applying it to resolve a case or controversy. It is no less adjudicatory than such a decision would be.

The guidance document confirms these points. It explains how USCIS will enforce *Simeio* in other cases: For relocations that occurred before *Simeio* was decided, USCIS exercised its discretion to "not pursue new revocations or denials based upon failure to file an amended or new petition." App. 74. For relocations that occurred after *Simeio* was decided but before the guidance document was issued, USCIS would withhold enforcement if the employer filed the requisite new or amended

petition by a date certain. *Id.* at 75. And for relocations that occurred after the guidance document was issued, USCIS warned that employers "**must** file an amended or new petition before an H-1B employee starts working at a new place of employment not covered by an existing, approved H-1B petition." *Id.* at 76. This extended guidance, tempering retroactive enforcement to accommodate employers, confirms that *Simeio* did not simply announce a new rule for the future, but set forth the agency's view of what the material change regulation had meant from the date of its enactment.

ITServe objects that the *Simeio* decision, in construing the regulation to encompass changes in the place of employment, contains reasoning that sweeps broadly and does not vary from case to case. But an agency "is not precluded from announcing new principles in an adjudicative proceeding." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). Adjudicating a specific controversy requires identifying the governing law, which may involve resolving disputes about what that law means. For this reason, we have held that "an interpretation given in the course of an informal adjudication," even if it expressly claims to govern "similarly situated" non-parties, is not a rule. *Conf. Grp.*, 720 F.3d at 965. To the contrary, the fact that an agency action governs a "large number" of similar cases "carries little weight" in deciding whether it is a rule or order. *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (cleaned up).

ITServe also argues that *Simeio* had no retroactive effect because the employer in that case had withdrawn its H-1B petition before the Administrative Appeals Office rendered its decision, which in turn caused the petition to be "immediately and automatically revoked" by operation of law. 8 C.F.R. § 214.2(h)(11)(ii). The record includes a letter, from USCIS to Simeio, referencing the withdrawal and revocation of an H-1B

petition. App. 70. Redactions to the letter exclude key identifying information, and the *Simeio* decision does not reference any possible revocation. Nonetheless, we will assume that the employer withdrew the relevant petition. We may even assume that USCIS decided an administrative appeal that, had it been pending before an Article III court, would have been dismissed as moot.

But mootness and retroactivity present different questions. As we explained in *Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017), the "prospective-retroactive distinction consistently focuses on the application of principles in the past or future." *Id.* at 896. Or as Justice Scalia put it: "Adjudication *deals* with what the law was; rulemaking deals with what the law will be." *Bowen*, 488 U.S. at 221 (Scalia, J., concurring). Viewed through that lens, *Simeio* was clearly retroactive. As shown above, it interpreted and applied the material change regulation to establish what the law *was*, regardless of whether that question presented a live and ongoing dispute in *Simeio* itself.[2]

Finally, ITServe notes that USCIS's predecessor agency proposed but never adopted a rule that would have required an amended H-1B petition whenever a covered employee moved

---

[2] We recognize that announcing broad policies through moot adjudications might sometimes violate the bedrock principle that "agencies must act without arbitrariness," including when choosing whether to proceed by rulemaking or adjudication. *Tennessee Gas Pipeline Co. v. Fed. Power Comm'n*, 606 F.2d 1373, 1380 (D.C. Cir. 1979) ("the arbitrariness standard may beyond some distant point confine the business of agencies in a manner remotely akin to article III"). Here, though, the *Simeio* dispute was live when USCIS initiated the "process for the formulation of an order." 5 U.S.C. § 551(7). And while ITServe points to other instances where USCIS declined to resolve moot controversies, it does not separately contend that USCIS acted arbitrarily by deciding *Simeio* on the merits.

to a new worksite. *See* Petitioning Requirements for the H Nonimmigrant Classification, 63 Fed. Reg. 30,419, 30,422 (proposed June 4, 1998). But the failure to adopt that rule has no bearing on whether *Simeio* permissibly interpreted the material change regulation to have already imposed the same obligation.

In short, *Simeio* is exactly what it purports to be—an informal adjudication resting on USCIS's interpretation of the material change regulation.

IV

ITServe argues that USCIS lacks statutory authority to require sponsoring employers to file new or amended H-1B petitions when they move covered employees to new worksites. We disagree.

Two distinct grants of authority bear on this question. First, Congress charged the Department of Homeland Security "with the administration and enforcement" of the Immigration and Nationality Act. 8 U.S.C. § 1103(a)(1). And USCIS is the DHS component responsible for administering and enforcing the INA's H-1B visa program. 6 U.S.C. § 271(b)(5). Second, Congress directed USCIS to determine the "question of importing any alien as a nonimmigrant" with H-1B status, based on petitions from prospective employers. 8 U.S.C. § 1184(c)(1).

These provisions amply support *Simeio*'s interpretation of the material change regulation. To qualify an alien for H-1B status under the INA, the prospective employer must file an LCA with the Department of Labor. 8 U.S.C. § 1101(a)(15)(H)(i)(b). In the LCA, the employer must make various promises, including one to pay the employee at least the prevailing wage in the local geographic area. *Id.*

§ 1182(n)(1)(A)(i). These promises are conditions for securing H-1B status and thus bear on the "question of importing" H-1B aliens. That is why USCIS regulations require a prospective employer to submit an approved LCA as part of its initial H-1B petition. 8 C.F.R. § 214.2(h)(4)(iii)(B). But the employer's obligations do not end once USCIS approves the H-1B petition. And ensuring that the employer keeps its promises thus falls squarely within "administration and enforcement" of the INA. That is why, to support compliance review on the back end, the material change regulation requires an amended H-1B petition if there are "material changes" in the terms of covered employment, including changes bearing on "the alien's eligibility" for H-1B status "as specified in the original approved petition." *Id.* § 214.2(h)(2)(i)(E). Finally, as *Simeio* explained, the transfer of a covered employee from one area to another bears on this eligibility, for the prevailing wage in one area might not be the prevailing wage in another. *See* 26 I & N Dec. at 548.

ITServe objects that USCIS's section 1184(c)(1) authority is focused on the "question of importing" H-1B workers, which, it says, does not include policing what happens once the workers are already here. Yet the INA expressly contemplates employers filing new or amended section 1184(c)(1) petitions on behalf of aliens already admitted into the United States, such as when the alien changes employers. 8 U.S.C. § 1184(c)(9)(A) & (12)(A). The INA also specifies post-entry situations not requiring amended petitions, such as when the sponsoring employer is involved in a corporate restructuring but the terms of employment do not change. *Id.* § 1184(c)(10). This would be surplusage if ITServe were correct that USCIS's section 1184(c)(1) authority shuts off once the H-1B worker enters the country.

In any event, policing compliance with the terms of an LCA plainly constitutes "administration and enforcement" of the INA, which section 1103(a)(1) independently authorizes. As explained, the statutory requirements for an H-1B visa, and the LCA promises made to obtain it, remain effective throughout the term of authorized employment—an employer cannot promise to pay an alien $100 per hour to work as a rocket scientist in Los Angeles, secure his entry on that basis, and then ship him off to drive a cab in Boston. Moreover, an admitted H-1B worker who fails to maintain qualifying employment will lose non-immigrant status and become removable. 8 U.S.C. § 1227(a)(1)(C)(i). The material change regulation thus allows USCIS to monitor changing facts that bear on its enforcement responsibilities, including facts regarding where H-1B workers are employed.

ITServe further objects that only the Department of Labor may police questions about the wages and working conditions of H-1B employees. As ITServe explains, the INA gives the Department enforcement responsibilities at the front and back ends of the H-1B process: At the front end, Labor must review an LCA for "completeness and obvious inaccuracies" and must decide whether to approve it within seven days. 8 U.S.C. § 1182(n)(1)(G)(ii). At the back end, Labor must investigate alleged LCA violations and may fine employers for them. *Id.* § 1182(n)(2)(A), (C). But these authorities are not by their terms exclusive, so as to oust USCIS from its own authority over the H-1B petition process. And the INA strongly suggests that the agencies' respective authorities are complementary rather than exclusive: The statute requires USCIS to adjudicate H-1B petitions "after consultation" with Labor. *Id.* § 1184(c)(1). That would be an odd way for Congress to convey that USCIS, in dealing with prevailing-wage or other LCA terms, may do nothing more than confirm the fact that the Department of Labor, after its compressed and limited initial

review, has approved an LCA filed before or after the covered alien has entered the country.

Because USCIS may consider LCA-related issues in exercising its own authority to approve, disapprove, or revoke H-1B petitions, it may require new or amended petitions corresponding to changes in the place of employment that necessitate the filing of new LCAs.

*Affirmed.*