RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0070p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

BROWN-FORMAN CORPORATION, dba Woodford
Reserve Distillery,

        *Petitioner/Cross-Respondent*,

   *v.*

NATIONAL LABOR RELATIONS BOARD,

        *Respondent/Cross-Petitioner*,

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL
UNION No. 651,

        *Intervenor*.

Nos. 24-2107/25-1060

─────────────────

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 09-CA-307806; 09-CA-311850; 09-RC-305269.

Argued:  December 11, 2025

Decided and Filed:  March 6, 2026

Before:  McKEAGUE, GRIFFIN, and MATHIS, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Oliver B. Rutherford, SMITH & SMITH ATTORNEYS, Louisville, Kentucky, for Brown-Forman Corporation.  Barbara A. Sheehy, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.  Willie J. Burden, Jr., International Brotherhood of Teamsters, Washington, D.C., for Intervenor.  Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Amici Curiae.  **ON BRIEF:**  Oliver B. Rutherford, Jacob W. Crouse, SMITH & SMITH ATTORNEYS, Louisville, Kentucky, for Brown-Forman Corporation.  Barbara A. Sheehy, Usha Dheenan, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.  Pamela M. Newport, HERZFELD, SUETHOLZ, GASTEL LENISKI & WALL, PLLC, Cincinnati, Ohio, Maneesh Sharma, AFL-CIO, Washington, D.C.,

for Intervenor.  Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Amici Curiae.

McKEAGUE, J., delivered the opinion of the court in which GRIFFIN, J., concurred. MATHIS, J. (pp. 32–56), delivered a separate dissenting opinion.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.  Employees at Brown-Forman Corporation's ("Brown-Forman") Woodford Reserve facility were unhappy with their compensation.  To meet an unanticipated increase in demand for the facility's whiskey products, Brown-Forman attempted to ramp up production, but employee wages remained stagnant and uncompetitive.  Naturally, Brown-Forman started to experience difficulties retaining its workforce.

Some employees contacted the International Brotherhood of Teamsters to discuss forming a union.  Initially, the organizing efforts did not gain much traction.  However, after Brown-Forman announced a mere $1 across-the-board salary increase, and informed employees that no further increases would be forthcoming, support for the union grew.  Meetings with the union became well-attended, union representatives were prevalent outside the facility to hand out fliers, and the union displayed an inflatable "fat cat" outside the entrance.

But as the organizing campaign gained momentum, Brown-Forman did not sit idly by.  In an alleged effort to curtail the organizing campaign, Brown-Forman announced it would make three significant changes to employee compensation.  Brown-Forman told employees it was going to (1) give a new $4-per-hour across-the-board pay raise to all employees, (2) expand its pay progression and merit-based salary increase policy, and (3) allow employees to save their vacation hours during the December holidays.  By giving employees what they wanted—better compensation—union support began to dwindle.  Nonetheless, the union declared its purported majority support via authorization cards and petitioned for an election.

As the election approached, Brown-Forman did not back down.  Management would meet with employees (to, at least in part, articulate anti-union talking points), and a week before

the election, Brown-Forman gifted employees bottles of bourbon.  When it came time to vote, the union failed to secure a majority.  Only 14 employees voted in support of the union while 45 employees voted in opposition.

An Administrative Law Judge determined that Brown-Forman committed unfair labor practices and interfered with its employees' efforts to unionize.  The Administrative Law Judge recommended issuing a bargaining order under the standards articulated in *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130, 2023 WL 5506930 (2023) and *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).  The National Labor Relations Board (the "Board") adopted the Administrative Law Judge's factual findings and recommended remedy, but it modified the reasoning.  Rather than consider whether a new election could be held by applying the *Gissel* standard, the Board relied solely on the standard articulated in *Cemex* (a previous Board decision that upended over 50 years of precedent and called for the Board to issue a bargaining order as the default remedy once it set aside an election).  Because the Board relied solely on the *Cemex* standard to issue the bargaining order against Brown-Forman, we must—for the first time— determine whether this new standard can serve as the basis for a bargaining order.

Because the *Cemex* standard was created through an improper exercise of the Board's adjudicatory authority, it cannot serve as the basis for a bargaining order.  Thus, we **GRANT** Brown-Forman's petition for review, **DENY** the Board's cross-petition for enforcement, and **REMAND** for proceedings consistent with this Opinion.

## I.  BACKGROUND

### A.  Factual Background

Brown-Forman operates a facility in Versailles, Kentucky that distills, bottles, and distributes Woodford Reserve bourbon.  In February 2022, employees at this facility began contacting the International Brotherhood of Teamsters to inquire about organizing a union.  While employees' interest in unionization was initially tepid, after Brown-Forman announced a modest $1-per-hour across-the-board pay raise, interest grew.  Employees considered the $1 raise inadequate.

Brown-Forman's management—which opposed unionization—took notice of the intensifying organizing campaign. The union had started stationing representatives outside the facility to distribute pamphlets about the benefits of organizing, and the union also displayed an inflatable "fat cat" by the entrance. Management decided to hold "debrief" meetings with employees to get a sense of the organizing campaign's progress. And when they learned that it was likely the union had authorization cards from 50-60% of employees, management was shocked and alarmed. The email exchange between Brown-Forman executives when they learned about the union's support is telling. One replied "Fudge!!!!" Another responded: "This is not good news. Ugh. . . . [T]his is far more advanced than I was expecting." And another, recognizing that the growing union support was due to dissatisfaction with compensation, fixated on next steps, explaining that it was time to move forward with additional compensation changes.

In an attempt to temper the organizing campaign's momentum, various managers and supervisors at the Woodford Reserve facility began discussing options to increase employee benefits with an emphasis on implementing any changes as soon as possible, even if the timing would be out of step with the company's historical practices for adjusting compensation policies. Despite previously communicating to employees that there would be no additional raises until the next fiscal year, in the wake of the growing support for unionization (which the "Woodford Reserve Distillery Organizing Committee" expressed to management in an unsigned letter), Brown-Forman announced it would institute a $4-per-hour raise for all employees. This was the first time Brown-Forman gave employees at the Woodford Reserve facility two across-the-board wage increases in the same year. Brown-Forman also announced other adjustments to employee benefits around the same time. The company decided to extend the pay progression and merit-based salary increase policy to new and recently promoted employees (who were previously excluded from these raises) and give employees more freedom to choose when to take time off around the December holidays.

Coinciding with the announced changes to employee compensation and benefits, Brown-Forman management held mandatory meetings with employees to discuss unionization. The meetings emphasized that unionization could interfere with the company's flexibility to adjust

and increase wages, citing the $4-per-hour across-the-board raise as an example of what management could do when it need not negotiate with a union.  Nonetheless, the organizing campaign continued, and the union mailed Brown-Forman management a letter declaring its majority support, attaching a copy of the election petition it filed with the NLRB.  However, after the across-the-board raise announcement, employees who had previously signed authorization cards supporting the union began to change their minds.  Some employees saw the pay raise as a "bribe" worth taking.  One employee asked for his authorization card back, and another told union representatives that because of the extra $4 per hour, he would no longer support the union.

As the election approached, the $4-per-hour raise went into effect, and one week before the election, Brown-Forman gave employees bottles of bourbon.  The election failed with 14 votes cast in support of the union and 45 votes cast in opposition.  The union objected, claiming Brown-Forman and its managers committed unfair labor practices that interfered with the union election.

**B.  Procedural History**

An Administrative Law Judge concluded that Brown-Forman committed unfair labor practices and recommended ordering Brown-Forman to cease-and-desist from engaging in conduct that violates the National Labor Relations Act ("the Act").  The Administrative Law Judge also recommended issuing a bargaining order that would direct Brown-Forman to recognize and negotiate with the union, citing both *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130, 2023 WL 5506930 (2023) and *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) as the standards that support such a remedy.  Brown-Forman filed exceptions to the decision.  The Board agreed with the Administrative Law Judge, although in issuing the bargaining order, it relied solely on the *Cemex* standard, explicitly stating that it was *not* relying on *Gissel* to issue the bargaining order.  *Brown-Forman Corp.*, 373 NLRB 145, slip op. at *1 n.4 (Dec. 16, 2024).  This petition followed, presenting our first review of the *Cemex* bargaining order standard's validity.

## II.  STANDARD OF REVIEW

We "defer[] to the 'Board's findings of fact, reasonable inferences from the facts, and applications of law to the facts if they are supported by substantial evidence on the record considered as a whole.'"  *Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 528 (6th Cir. 2024) (quoting *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 469 (6th Cir. 2019)).  And while "the Board has 'broad discretion'" to fashion an appropriate remedy for violations of the Act, *id.* at 529 (quoting *NLRB v. ADT Sec. Servs., Inc.*, 689 F.3d 628, 635 (6th Cir. 2012)), we must "exercise independent judgment in deciding whether [the Board] acted within its statutory authority," *id.* at 528 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393-95 (2024)).

## III.  ANALYSIS

On appeal, Brown-Forman argues that (1) the Board's factual findings related to the alleged unfair labor practices were not supported by substantial evidence, (2) the Board improperly considered pre-petition conduct in evaluating the alleged unfair labor practices, (3) the Board acted outside the scope of its remedial authority when it established the *Cemex* standard in contradiction of Supreme Court precedent, (4) the Board created the *Cemex* standard through an improper exercise of its adjudicatory authority, and (5) the Board erred in retroactively applying *Cemex* to Brown-Forman.

We hold that the Board's factual findings regarding Brown-Forman's unfair labor practice violations were supported by substantial evidence, and that the Board properly considered pre-petition conduct.  However, we deny the Board's petition for enforcement because in issuing the bargaining order against Brown-Forman, the Board relied solely on the *Cemex* standard, which was created through an unlawful exercise of adjudicatory authority.  *See FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 587 (2025) ("[A]n agency action cannot stand 'unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.'" (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("*Chenery I*"))).  With part of the Board's fashioned remedy deemed invalid, we will remand the entire order, allowing the Board to start fresh with the proper standards in mind.  *See Calcutt v. Fed.*

*Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) ("[T]he function of the reviewing court ends when an error of law is laid bare.").

### A. Substantial Evidence Shows Brown-Forman Committed Unfair Labor Practices

The Board found that Brown-Forman committed unfair labor practices—violating Section 8(a)(1) and (3) of the Act—by making, announcing, and implementing its decisions to (1) give a $4-per-hour across-the-board raise, (2) modify employee benefits, and (3) gift employees a bottle of bourbon. Brown-Forman challenges those findings on appeal.

"[W]e ask only whether 'the record considered as a whole' supports the Board's factual conclusions on these fronts 'by substantial evidence.'" *NLRB v. Starbucks Corp.*, 159 F.4th 455, 462 (6th Cir. 2025) (quoting 29 U.S.C. § 160(e)). "Substantial evidence exists when 'the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached.'" *Id.* (quoting *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012)). This is not a high threshold. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). As courts review the Board's factual findings, substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

Employees "have the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" those rights. *Id.* § 158(a)(1). And Section 8(a)(3) prohibits an employer from discriminating "in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

If substantial evidence indicates that the employer's conduct "had a reasonable tendency to coerce" employees as they attempt to exercise their rights, then an unfair labor practice violation has occurred. *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 543 (6th Cir. 2016) (quoting *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005)). And precedent makes clear that it is coercive for an employer to discourage union support by promising or conferring economic benefits. *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964). The Act

"prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *Id.* Particularly when employers have made their anti-union preferences clear, "[w]ell-timed increases in benefits" suggest "a fist inside the velvet glove," and "[e]mployees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Id.*

Here, there is more than enough evidence to support the Board's conclusion that Brown-Forman's velvet glove of benefits was hiding a clenched fist of coercion, interference, and discouragement. Brown-Forman management was aware of growing union support. Nelson, the Woodford Reserve Plant Director, saw crowds of supporters and an inflatable "fat cat" outside the facility. Admin. R. Volume 1, PageID 777-80. He then met with employees to communicate Brown-Forman's anti-union position. *Id.* at PageID 260-61, 777-80. And after speculating that the union likely had authorization cards from 50-60% of the employees, and learning that the focal point of the organizing campaign revolved around dissatisfactory compensation, Brown-Forman management set out on an accelerated, targeted effort to interfere with employees' free exercise of their right to organize and discourage their participation in a union by conferring upon employees various benefits and gifts. Admin. R. Volume 2, pt. 2 at PageID 265-71, 281. Notably, the conferred benefits reflect a significant position shift. Brown-Forman management had previously communicated to employees that any additional wage increases would have to wait until the following fiscal year, but they reversed course after learning about the union's support. Admin. R. Volume 1 at PageID 498-501. And, the benefits were unprecedented, representing the first time that employees received two across-the-board wage increases in the same year. *Id.* at PageID 297-98. It is no large leap to infer that Brown-Forman's change of heart indicated an attempt to coerce employees and discourage union membership. The internal email chain among Brown-Forman management confirms this notion, as their anti-union motivations were laid bare. Admin. R. Volume 2, pt. 2 at PageID 265-71, 281.

Substantial evidence supports the finding that employees took the hint and understood that the benefits were a "bribe" to no longer support the union. *Id.* at PageID 301. That was

Brown-Forman's intent, and it worked.  The union's majority crumbled and the election failed. Between the internal email chain in which Brown-Forman management discussed the new compensation plans (and their anti-union motives), *id.* at PageID 265-71, 281, and the circumstantial evidence from which it is reasonable to infer that the benefits were conferred to undermine, interfere with, and discourage unionization, the Board had more than enough evidence in the record to meet our deferential standard and determine Brown-Forman committed unfair labor practices.

Brown-Forman also argues that the Board erred in finding that the decisions to increase wages and modify benefits (and the respective announcements of those decisions) violated Section 8(a)(1) of the Act because this conduct occurred before the union filed its election petition.  We disagree.

The crux of Brown-Forman's argument centers on the Board's rule—"established . . . for the purpose of administrative convenience"—that focuses its review of unfair labor practice to post-petition conduct.  *Randall, Burkart/Randall Div. of Textron, Inc. v. NLRB*, 638 F.2d 957, 960 (6th Cir. 1981).  To start, nothing in the Act—nor Supreme Court precedent—limits the Board's review to post-petition conduct.  *See NLRB v. Curwood Inc.*, 397 F.3d 548, 554 (7th Cir. 2005) (discussing *Exch. Parts*, 375 U.S. at 409).  But even when the Board invokes this rule of administrative convenience, it still considers pre-petition conduct "when there is significant post-petition conduct related to or continuing from pre-petition events."  *Randall*, 638 F.2d at 960.

Here, even though the union did not file its election petition before Brown-Forman decided to confer these benefits on its employees, the company's management anticipated an election was imminent, acknowledging that its efforts to undermine a likely impending election would constitute "an intense six weeks."  Admin. R. Volume 2, pt. 2 at PageID 271.  Brown-Forman management decided that the wage increase should take effect on November 1, within the predicted post-petition time frame.  And this wage increase was one piece of Brown-Forman's larger effort to undermine the union election with benefits and gifts.  Brown-Forman gave one such gift—the bottles of bourbon—one week before the election.  In this context, Brown-Forman's decision to confer these benefits continued into—and were related to—coercive activity that took place during the post-petition period.  Thus, the Board did not err in

finding that Brown-Forman's decisions to increase wages and modify benefits (and the respective announcements of those decisions) constituted violations of the Act.  The Board's decision is supported by substantial evidence, and the Board properly considered pre-petition conduct.

**B.  Bargaining Order Relied Solely on the Invalid *Cemex* Standard**

After determining that Brown-Forman committed unfair labor practices, the Board issued a bargaining order, "an extraordinary remedy" that forces a company to recognize a union even though the election failed.  *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 519 (6th Cir. 1998) (quoting *Henry Bierce Co. v. NLRB*, 23 F.3d 1101, 1110 (6th Cir. 1994)).  The Board is empowered to issue a bargaining order, but only if other remedies are insufficient to protect employees' choice to unionize.  Bargaining orders are considered a last resort, *id.*, because "secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support," *Gissel*, 395 U.S. at 602; *see also NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 232 (6th Cir. 2000) ("In general, 'an election is the preferred method of determining the choice by employees of a collective bargaining representative.'" (quoting *United Servs. for the Handicapped v. NLRB*, 678 F.2d 661, 664 (6th Cir. 1982))).

The preference for secret-ballot elections as the barometer of a union's support among employees stems from the fundamental goal of national labor policy to best respect workers' preferences on unionization.  *See Gissel*, 395 U.S. at 596 & n.8 (citing *Aaron Bros. Co.*, 158 NLRB 1077 (1966) and *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731 (1961) to explain that employers would need to recognize a union with majority support, but also could not recognize a union with only minority support); *see also Aaron Bros.*, 158 NLRB at 1078 (explaining that "[a]n election by secret ballot is normally a more satisfactory means of determining employees' wishes" than alternative ways to measure union support).  In the Taft-Hartley Act, Congress announced its intent to protect employees from both employer-based and union-based conduct that could interfere with workers' rights as they decide whether unionization best serves their interests.  Labor Management Relations (Taft-Hartley) Act, Pub. L. 80-101, 60 Stat. 136, § 1 (1947) (explaining its intent to balance the rights of employers and

employees and "protect[] the rights of individual employees in their relations with labor organizations"). And a little over a decade later, in an effort to curb "instances of breach of trust, corruption, [and the] disregard of the rights of individual employees" among unions, the Landrum-Griffin Act reinforced Congress's effort to empower workers in their relations with both employers and unions. Labor Management Reporting and Disclosure (Landrum-Griffin) Act, Pub. L. 86-257, 73 Stat. 519, 29 U.S.C. § 401. The will of the worker should prevail, and in most situations secret-ballot elections best represent employees' true preferences regarding unionization.

The Supreme Court articulated a standard in *Gissel* that preserved the long-standing preference for secret-ballot elections yet still recognized that bargaining orders can serve as a safety net to mitigate employer misconduct. *Gissel*, 395 U.S. at 614. Under *Gissel*, "where there is . . . a showing that at one point the union had a majority" of employees' support, and the employer's misconduct (or likely repeated misconduct) made the prospect of a fair election unlikely, the Board could issue a bargaining order. *Id.* at 614-15. The *Gissel* standard withstood the test of time, serving as the Board's applicable bargaining-order standard for decades.

But to issue a bargaining order against Brown-Forman in this case, the Board relied solely on the new standard that the Board articulated in the 2023 *Cemex* adjudication. The *Cemex* standard purportedly "replac[ed] the *Gissel* standard" and shifted over 50 years of precedent with "a fundamentally different rationale" to issue bargaining orders. *Cemex*, 2023 WL 5506930, at *36. The Board did not analyze whether a fair future election could occur. Instead, applying the *Cemex* standard, the Board defaulted to a bargaining order after determining that the initial election should be set aside.

This case presents our first review of the Board's new approach to bargaining orders. The substance of the *Cemex* standard reflects a significant shift from the *Gissel* standard. While the *Gissel* standard instructs the Board (and reviewing courts) to order an election when a fair one is possible—staying true to the preferred method of effectuating Congress's ultimate goal of preserving employees' preferences—the *Cemex* standard looks only at whether a previous election was not fair. Under *Cemex*, the Board no longer evaluates whether it could still use an election to measure contemporaneous employee sentiment regarding unionization.

But we do not reach the substance of the *Cemex* standard in this case because the Board announced this significant policy change via an adjudication, and it did so without respecting the bounds of its adjudicatory authority.  The *Cemex* standard was not derived from the case-specific facts of the contemporaneous adjudication, and the *Cemex* Board did not create the standard in furtherance of resolving the parties' dispute.  While the dissent is willing to overlook these transgressions, we are not.  We thus hold that the *Cemex* standard was improperly promulgated, so it cannot serve as the basis for future orders.  *Wages & White Lion Invs.*, 604 U.S. at 587.

In turn, by relying solely on the invalid *Cemex* standard, the Board issued its bargaining order against Brown-Forman without proper justification.  Charged with ensuring that the Board operates within the confines of its congressionally delegated authority, we cannot enforce this order, as it reflects the exercise of powers the Board does not possess.[1]

### 1.  The Board's Policymaking Authority

Congress bestowed upon the Board the "primary responsibility for developing and applying national labor policy."  *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990).  The Board has two different processes by which it can exercise this policymaking responsibility: rulemaking and adjudication.  29 U.S.C. § 156 (rulemaking); 29 U.S.C. § 160 (adjudication).  Each is unique, bound by different parameters and designed to serve distinct purposes.  Congress directed the Board to use its rulemaking authority (in accordance with the Administrative Procedure Act's requirements) to create "such rules and regulations as may be necessary to carry out the provisions of [the Act]," 29 U.S.C. § 156, and empowered the Board to use its adjudicatory authority to resolve disputes between parties, which can serve as precedent for future adjudications, *id.* § 160.  "Most administrative agencies, like the Labor Board here, are granted two functions by the legislation creating them: (1) the power under certain conditions to make rules having the effect of laws, that is generally speaking, quasi-legislative power; and

---

[1]Importantly, here, the Board cited the *Cemex* standard as precedent and did nothing more.  The Board did not explain why the case-specific facts warranted creating and applying an alternative to the *Gissel* standard as it attempted to resolve the parties' dispute.  The Board cannot rely on an invalid standard (i.e., *Cemex*), nor can it apply a new standard without proper justification.  *See Allentown Mack Sale & Servs., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (referencing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)) (explaining that the Board's "adjudication is subject to the requirement of reasoned decisionmaking").

(2) the power to hear and adjudicate particular controversies, that is quasi-judicial power." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 770 (1969) (Black, J., concurring); *see also* 5 U.S.C. § 551(4)-(7) (defining rulemaking as the "process for formulating" "an agency statement of general or particular applicability and future effect," and defining adjudication as the "process for the formulation of" "a final disposition . . . of an agency in a matter other than rule making"); *Allentown Mack Sale & Servs., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (looking to the Administrative Procedure Act as a guide to evaluate the propriety of the Board's actions). These parameters reflect Congress's careful and intentional delegation of its legislative powers, establishing guardrails that protect the public's role in the policymaking process and maintain accountability over agency action. 5 U.S.C. § 553; *see also Loper Bright*, 603 U.S. at 391, 393.

Our role in evaluating the Board's exercise of its respective authorities is clear. Courts are charged with the essential task of "recognizing constitutional delegation, 'fixing the boundaries of the delegated authority,' and ensuring the agency has engaged in 'reasoned decisionmaking' *within those boundaries*." *Loper Bright*, 603 U.S. at 395 (emphasis added) (quoting H. Monaghan, *Marbury* and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983) and *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). As is relevant here, some of those boundaries are procedural, so even where the substance of the Board's policy may fall within its general area of delegated power, improper "reliance on adjudication" warrants invalidating the Board's action. *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974). Thus, if the Board decides to make policy through adjudication, it must abide by the procedural limitations Congress placed on its adjudicatory authority.

## 2. Limitations on the Board's Adjudicatory Authority

While the Board's adjudicatory authority is designed to provide "administrative flexibility," the Board must still operate "within appropriate statutory limitations." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945). Given the case-specific nature of the Board's adjudication process, 29 U.S.C. § 160, it comes as no surprise that the Board's adjudicatory authority is limited to resolving the dispute of the parties that stand before it. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 348 (1938) ("[T]he relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress."); *see also, e.g.*,

*Republic Aviation*, 324 U.S. at 798 (holding that the Board's adjudicatory powers are meant to "apply[] the Act's general prohibitory language" to "the infinite combinations of events" with which it is presented); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12 (1940) (explaining that the Board's adjudicatory authority can only be used for "action to achieve the remedial objectives which the Act sets forth"). The Board's adjudicatory authority "is restricted" to determining whether a violation of the Act occurred and fashioning a remedy to undo the effects of said violation. *See Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 676-77 (1961); *see also Henry Bierce Co.*, 23 F.3d at 1110 (through its adjudicatory power, the Board acts "to fashion remedies in order to undo the effects of violations of the Act").

Limiting the Board's adjudicatory authority to resolving case-specific disputes is a familiar and unremarkable administrative law concept. This basic, overarching principle forms the foundation of the Administrative Procedure Act's guide to agency action; agencies are prohibited from using adjudication to engage in rulemaking. 5 U.S.C. § 551(4)-(7). And, as precedent makes clear, the Administrative Procedure Act "means what it says." *Loper Bright*, 603 U.S. at 393.

In what has become the seminal case to define the limits of adjudicatory authority, the Supreme Court explicitly outlined these procedural boundaries for the first time in *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ("*Chenery II*"). As articulated in *Chenery II*, an agency is authorized to act "in the form of an order, entered after a due consideration of the particular facts in light of the relevant and proper standards." *Id.* at 201. That limitation on the agency—the requirement that it base its decision on the particular dispute in front of it—applies "regardless of whether those standards previously had been spelled out in a general rule or regulation." *Id.*

*Chenery II* continued by contrasting an agency's adjudicatory authority with its rulemaking authority, explaining that an agency, "unlike a court, . . . [has] the ability to make new law prospectively through the exercise of its rule-making powers," so "it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework" of its authorizing statute. *Id.* at 202. "The function of filling the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." *Id.*

But even if an agency should, "as much as possible," exercise its rulemaking authority to create a new policy that "fill[s] the interstices of" its authorizing statute, "any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Id.* "Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule" through the formal rulemaking process. *Id.* Instead, the agency must be free to articulate, through adjudication, those "principles [that] must await their own development" or "must be adjusted to meet particular, unforeseeable situations." *Id.* "[I]nsist[ing] upon one form of action" does not lead to "the exclusion of the other" from the agency's toolbox. *Id.*

*Chenery II* made clear that there is "a very definite place for the case-by-case evolution of statutory standards," outlining the types of problems adjudicatory authority is served to address. *Id.* at 203. For example,

> problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. *In those situations*, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective.

*Id.* at 202-03 (emphasis added).

Notably, in each of the situations in which *Chenery II* endorsed an agency utilizing its adjudicatory authority to articulate precedent-setting standards, the agency must derive the standard from a case-specific need to resolve the parties' dispute. Adjudicatory authority is reserved for the problems that arise "in a case," and any articulated standard should address that "particular problem" rather than create "a hard and fast" or "general rule." *Id.* Thus, when courts analyze whether an agency properly exercised its adjudicatory authority, one question we ask as a "guide for our review" is whether the agency "derived its conclusions from the particular facts in the case." *Id.* at 204.

Two decades later, the Supreme Court applied *Chenery II*'s principles to the Board, reaffirming the procedural limitations on adjudicatory authority and concluding that the Board

crossed the line. *Wyman-Gordon Co.*, 394 U.S. at 765-66 (plurality opinion).**2** The Board had ordered an employer "to furnish a list of the names and addresses of its employees who could vote in the [union] election," relying on "a rule laid down in an earlier decision by the Board [in] *Excelsior Underwear Inc.*, 156 NLRB 1236 (1966)." *Wyman-Gordon*, 394 U.S. at 761-62. As the Supreme Court explained, in *Excelsior* (the underlying adjudication), the Board "purported to establish the general rule that such a list must be provided, but it declined to apply its new rule to the companies involved in the Excelsior case." *Id.* at 763. The Board did not develop the *Excelsior* rule due to the facts of the case before it; instead, it cited its general interest in developing the standards "necessary" to "discharg[e] . . . the Board's function to conduct elections in which employees have the opportunity to cast their ballots . . . under [free] circumstances." *Excelsior*, 156 NLRB at 1240. Importantly, the Board did not even conduct an analysis regarding whether retroactive application to the specific parties was appropriate; the Board never intended the *Excelsior* standard to resolve the dispute before it and instead wanted to create a general rule for future elections. *Id.* at 1239-40 & n.5, 1246-47. It used the adjudicative process to do so.

A majority of the justices took issue with the Board's *Excelsior* adjudication because it created a "rule[] of general application," *Wyman-Gordon*, 394 U.S. at 764, rather than a standard conceived to aid the Board in resolving the parties' dispute, *id.* at 765 ("There is no question that, in an adjudicatory hearing, the Board could validly decide the issue whether the employer must furnish a list of employees to the union."). The Supreme Court chastised *Excelsior* as an improper use of adjudicatory authority, explaining that

> [t]he rule-making provisions of [the Act], which the Board would avoid, were
> designed to assure fairness and mature consideration of rules of general
> application. They may not be avoided by the process of making rules in the

---

**2**While *Wyman-Gordon* was a plurality opinion, a majority of the justices agreed that the Board engaged in an improper adjudicative rulemaking. *See* 394 U.S. at 763-65, 766 & n.6 (noting that Justice Harlan's dissent merely disagreed with the plurality's conclusion that remand would be futile because, even though the Board cited to an improper adjudicative rulemaking, previous Supreme Court cases specifically endorsed the practice in question); *see also id.* at 777 (Douglas, J., dissenting) (similarly criticizing the Board's improper adjudicative rulemaking). Here, unlike *Wyman-Gordon*, no such endorsement of the Board's *Cemex* standard exists. Further, unlike *Wyman-Gordon*, the Board's reliance on an improper adjudication was not accompanied by an independently sufficient justification for its order. *See id.* at 766 & n.6; *infra* section III.B.4. Thus, unlike *Wyman-Gordon*, remand here is proper: the Board's error was not harmless.

course of adjudicatory proceedings.  There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its invention.

*Id.* at 764.

Consistent with *Chenery II*, in *Wyman-Gordon*, the Supreme Court reiterated that "[a]djudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein."  *Id.* at 765.  But the Supreme Court also made clear that the Board's adjudicatory authority is separate and distinct from its general rulemaking authority, and the Board is not free to ignore the procedural boundaries that limit its use of that process; the Board can only articulate through adjudication policies that are crafted to resolve the parties' particular dispute.  *Id.* at 764-66 (plurality opinion) (contrasting "rules of general application" with fact-specific remedies fashioned to resolve the case before the Board); *id.* at 770 (Black, J., concurring) (explaining that it would be improper to "give judicial sanction" to "a purported 'adjudication' [that was] clearly not adopted as an incident to the decision of a case before the agency"); *id.* at 775-76, 777 (Douglas, J., dissenting) ("[I]f the Board decided to treat each case on its special facts and perform its adjudicatory function in the conventional way, we should have no difficulty in affirming its action.  The difficulty is that it chose a different course in the Excelsior case . . . . [A]n agency is not adjudicating when it is making a rule to fit future cases.  A rule like the one in Excelsior is designed to fit all cases at all times.  It is not particularized to special facts.  It is a statement of far-reaching policy covering all future representation elections.").

*Wyman-Gordon* rearticulated the foundational holding in *Chenery II*:  it is not the future, precedential effect of adjudication-based policies that runs afoul to the confines of the Board's adjudicatory authority; rather, the Board exceeds its authority when the policy or standard it creates through the adjudicative process is motivated not for the purpose of resolving the parties' dispute, but to advance the Board's general interest to "make . . . rules and regulations as [the Board] may [deem] necessary to carry out the provisions of [the Act]."  29 U.S.C. § 156.

Five years later, in *Bell Aerospace*, the Supreme Court continued to chart the same path, reiterating that when the Board exercises its adjudicatory authority, it has "a statutory duty to decide the issue at hand in light of the proper standards," and "this duty remain[s] 'regardless of

whether those standards previously had been spelled out in a general rule or regulation.'" 416 U.S. at 292 (quoting *Chenery II*, 332 U.S. at 201). *Bell Aerospace* reaffirmed the well-accepted concept that "the Board is not precluded from announcing new principles in an adjudicative proceeding," and held "that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." *Id.* at 294.[3] But as *Bell Aerospace* also made clear, the freedom to choose its preferred policymaking path does not absolve the Board of its obligation to abide by the limitations established for each procedure. *Id.*[4]

The Supreme Court was explicit: "there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act." *Id.* As to what those "situations" look like, *Bell Aerospace* continued to fine tune the limitations on adjudicatory authority established in *Chenery II*, explaining that policymaking through adjudication is meant for situations in which the announced standard would not "have more than marginal utility." *Id.* Where the Board can "proceed with caution, developing its standards in a case-by-case manner with attention to the specific character" of the parties' dispute, adjudication may be an acceptable policymaking path. *Id.*

More recently, our circuit has reiterated these principles. In *Kindred Nursing Centers East, LLC v. NLRB*, 727 F.3d 552 (2013), an employer challenged the rule the Board created in

---

[3]The context of *Bell Aerospace* is important. The question before the Supreme Court was "not whether the Board should have resorted to rulemaking, or in fact improperly promulgated a 'rule[]'" in a previous adjudication. 416 U.S. at 291. The question before the Supreme Court was whether the Board was bound to use rulemaking, rather than adjudication, to determine whether certain individuals constituted "managerial employees" after the Supreme Court's remand. *Id.* at 290-91. When presented with a particular problem in an adjudication (i.e., whether certain individuals fell under the definition of "managerial employees"), the Board has the initial discretion to decide whether it could solve the problem with a case-specific order that resolves the parties' dispute, or whether formal rulemaking would be necessary. *Id.* at 294. And that decision is subject to judicial review to ensure that after the choice is made, the Board abides by Congress's limitations on the specific policymaking power. *Id.* In *Bell Aerospace*, the Board had not yet made a choice on how it would proceed on remand. *Id.* at 291.

[4]*Bell Aerospace* stands for the principle that the Board has a full playbook to use as it makes policy. The Board can choose to run the ball (adjudication), or it can choose to pass the ball (rulemaking). But once the Board chooses a run play, it cannot throw the ball downfield after crossing the line of scrimmage; the Board cannot exercise its rulemaking power through the adjudication process. *See Bell Aerospace*, 416 U.S. at 294 (recognizing limitations on adjudicatory authority); *see also, e.g.*, *Kindred Nursing Ctrs. E., LLC v. NLRB*, 727 F.3d 552, 565 (6th Cir. 2013) (quoting *Bell Aerospace*) (same). The dissent agrees with us that the Board is free to make that initial choice. But we, unlike the dissent, do not swallow our whistles once the play starts. The "great weight" afforded to that initial choice is not an open invitation to ignore the guardrails Congress imposed on adjudicatory authority after that choice is made. *Bell Aerospace*, 416 U.S. at 294.

*Specialty Healthcare & Rehabilitation Center*, 357 NLRB 934 (2011), arguing it was an improper rulemaking through adjudication.  We disposed of this challenge without a detailed analysis, as the employer presented only a cursory argument that failed to "explain[] why the Board's election of adjudication in [*Specialty Healthcare*] amounted to an abuse of discretion or a violation of the Act."  *Kindred Nursing*, 727 F.3d at 565.[5]  Still, we took the opportunity to reiterate "that 'there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act.'"  *Id.* (quoting *Bell Aerospace*, 416 U.S. at 294).

It makes sense that even where the Board properly exercises its adjudicatory authority, reviewing courts make a point to re-establish the contours of that policymaking power.  The Administrative Procedure Act requirements are not meaningless formalities; Congress delegated policymaking power to the Board, but it did so under the condition that when the Board would create a general rule that did not advance its case-specific remedial powers, it would follow precise procedural requirements.  29 U.S.C. § 156; 5 U.S.C. §§ 551(4)-(5), 553.  That includes publishing a notice of the proposed rule in the Federal Register, allowing interested parties the opportunity to submit comments, and, after considering relevant public feedback, promulgating the rule with a statement that includes the basis and purpose.  5 U.S.C. § 553.

This scheme was "designed to assure fairness and mature consideration of rules of general application," *Wyman-Gordon*, 394 U.S. at 764, ensure that "federal agencies are accountable to the public," *Department of Homeland Security v. Regents of University of California*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)), and serve "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," *Loper Bright*, 603 U.S. at 391 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).  If the Board could

---

[5]Notably, in the underlying adjudicative proceeding, the Board did not adopt a rule of general applicability; rather, based on the case-specific facts, the Board modified the precedent-based standard to better resolve the parties' dispute.  *See Specialty Healthcare*, 357 NLRB at 938 (overruling *Park Manor Care Center*, 305 NLRB No. 135 (1991) to return to a previous Board standard because "the acute care hospital rule does not by its terms apply here," and "*Park Manor* has done little to provide interested parties with guidance in defining the appropriate units in the long-term care industry").  Thus, the adjudicative principle at issue in *Kindred Nursing* was an appropriate use of adjudicatory authority.

circumvent the limitations of its delegated authority by promulgating general, non-case-specific rules through adjudication, it would upset Congress's careful delegation of legislative authority, run afoul of separation of powers constraints, deprive the public of its right to participate in the Board's quasi-legislative processes, and erase 29 U.S.C. § 156 from the United States Code. Courts uphold their essential function by holding firm on the limits of agency authority through judicial review. *Loper Bright*, 603 U.S. at 395-96.

With these principles in mind, we analyze whether the Board adhered to the procedural limitations on adjudicatory authority when it created the *Cemex* standard. Because the *Cemex* standard served as the sole justification for issuing a bargaining order against Brown-Forman, our analysis of the *Cemex* standard's validity is essential to resolving the matter before us.

### 3. *Cemex* was an Improper Exercise of Adjudicatory Authority

As indicated above, traditionally, when the Board contemplated issuing a bargaining order, it would proceed under the *Gissel* standard. In *Gissel*, the Supreme Court endorsed the Board's practice of issuing bargaining orders as a remedy for an employer's unfair labor practices. 395 U.S. at 610 ("[W]here an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside[,] [w]e have long held that the Board . . . has the authority to issue a bargaining order without first requiring the union to show that it has been able to maintain its majority status."). But *Gissel*'s endorsement of the Board's power to resort to a bargaining order, rather than take the "most satisfactory—indeed the preferred"—route of calling for a new election, was narrow. *Id.* at 602, 614-16. The Court recognized that a bargaining order would be appropriate if "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through [authorization] cards would, on balance, be better protected by a bargaining order." *Id.* at 614-15. While some "extraordinary cases" involve "outrageous" and "pervasive" unfair labor practices for which a bargaining order is the only available remedy (also known as Category I cases), in "less extraordinary cases" (also known as Category II cases) *Gissel* "call[s] for" the Board to "make the determination" that a "fair rerun election might not be possible." *Id.* at 613-

15. Simply put, to issue a bargaining order under *Gissel* for Category II violations, the Board would need to make a factual finding that "a fair election cannot [occur] under all the circumstances." *Ctr. Constr. Co., Inc. v. NLRB*, 482 F.3d 425, 437 (6th Cir. 2007).

Enter *Cemex*. In *Cemex*, the Board adjudicated a dispute in which a union organizing campaign obtained majority support via authorization cards, but a couple months later, the union election failed. 2023 WL 5506930, at *2-3. After affirming the Administrative Law Judge's findings related to the employer's unfair labor practices (i.e., coercive threats of adverse consequences if the employees unionized), the Board set aside the election, concluding that it was not a proper reflection of union support due to employer tampering. *Id.* at *9-10.

The *Cemex* Board then moved on to determine the proper remedy. Relying on *Gissel*—which had served as the legal standard for over 50 years—the Board determined that the employer "would likely meet a rerun election with a similarly aggressive union-avoidance strategy." *Id.* at *11. So, "[c]onsistent with the careful balancing of employee rights described by the Court in *Gissel*," the *Cemex* Board found "that issuing a bargaining order in th[e] case [before it]" was the proper remedy because, "under the circumstances," it was unlikely that a future fair election could be held. *Id.* at *15-16; *see also id.* at *17 ("[T]he whole record in this case . . . suggests that the [employer] would likely meet a renewed union campaign with further misconduct."). The *Cemex* Board concluded its remedial analysis by reiterating that the *Gissel* standard allowed it to fashion a remedy that was "warranted, necessary, and appropriate" to resolve the parties' dispute and undo the effects of the unfair labor practice violations. *Id.* at *17.

But despite its reliance on—and endorsement of—the *Gissel* standard as the appropriate means to resolve the adjudication that was before it, the *Cemex* Board then took an unexpected, unlawful turn. It created a new standard for issuing future bargaining orders that was neither derived from the case-specific facts nor in furtherance of fashioning a remedy that resolved the parties' dispute.[6] In doing so, the *Cemex* Board exceeded its adjudicatory authority.

---

[6]The Board also overruled its precedent in *Linden Lumber Division*, 190 NLRB 718 (1971), requiring employers to petition for an election if they want to challenge a purported majority. *Cemex*, 2023 WL 5506930, at *24-25. However, unlike in *Cemex*, the union that organized employees at Brown-Forman's facility petitioned for an election, so that aspect of the *Cemex* standard is not before us.

a.  The *Cemex* Standard was not Derived from Case-Specific Facts

The *Cemex* Board announced its new policy directive: "we will no longer look to *Gissel* bargaining orders" because "[d]ecades of experience administering the *Gissel* standard have persuaded us that *Gissel* bargaining orders are insufficient to accomplish the twin aims of 'effectuating ascertainable employee free choice' and 'deterring employer misbehavior.'" *Id.* at *26 (quoting *Gissel*, 395 U.S. at 614).[7]  But any perceived inadequacy with the *Gissel* standard could not have been realized from the parties' dispute because the *Cemex* Board had just declared—a mere eleven pages prior—that the *Gissel* standard allowed it to fashion a remedy that served those exact "twin aims." *Id.* at *15, *26 (explaining that, in the case before it, a *Gissel* bargaining order "simultaneously serves both purposes" of the Act: "effectuating ascertainable employee free choice and . . . deterring employer misbehavior"); *see also id.* at *17 (reiterating that the *Gissel* standard allowed the *Cemex* Board to resolve the case before it and "effectuate the purposes and policies of the Act").  Further, the *Cemex* Board admitted that its new standard was based not on the case-specific facts, but on general observations from "[d]ecades of experience administering the *Gissel* standard" in other adjudications. *Id.* at *26. The *Cemex* Board was not subtle in illustrating the lack of nexus between the new standard and the facts of the case before it.

---

[7]*Cemex* presented a misguided understanding of the Board's purported authority to advance the "twin aims of 'effectuating ascertainable employee free choice' and 'deterring employer misbehavior'" through adjudication. 2023 WL 5506930, at *26 (citing *Gissel*, 395 U.S. at 614).  The language establishing the Board's adjudicatory authority "should be construed in harmony with the spirit and remedial purposes of the Act." *Republic Steel*, 311 U.S. at 11.  "[I]t is not enough to justify the Board's requirements to say that [a remedial order] would have the effect of deterring persons from violating the Act." *Id.* at 12.  *Gissel*'s discussion of deterrence (to which *Cemex* cited to justify its general-deterrence-based motivations) refers to preventing an employer's ongoing violations; it does not grant the Board the broad authority to fashion remedies as a general means of deterring hypothetical, future conduct from employers not subject to the adjudication. 395 U.S. at 614 (discussing the Board's remedial powers as a means to address "an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future").  The deterrent effect of an order should be case-specific. *See, e.g.*, *id.* at 610 (framing deterrence as the means to prevent a party subject to the adjudication from "profit[ing] from his own wrongful refusal to bargain" (cleaned up) (quoting *Frank Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944))); *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 364 (1940) (holding that the Board can impose a remedial measure that serves to "prevent[] [the employer's] enjoyment of any advantage which he has gained by violation of the Act," referring to cease and desist orders directed at parties subject to the adjudication).  The Board's rulemaking authority provides the pathway for policies aimed at generally deterring certain conduct. 29 U.S.C. § 156.

b.　The *Cemex* Standard was not Created to Resolve the Parties' Dispute

In continuing to explain its rationale, the *Cemex* Board made it clear that its new standard was not remedial in nature—contravening the essence of its adjudicatory authority.　The *Cemex* Board emphasized that it wanted to shift the analytical focus to employer conduct that occurred during "the runup to an initial election" rather than the state of affairs after an election took place.　*Id.* at *27.　In theory, this would "mak[e] remedial bargaining orders more readily available."　*Id.* at *26.　But the *Gissel* standard was no barrier to considering an employer's actions in the runup period for the case that was before the *Cemex* Board.　In fact, the *Cemex* Board explicitly cited the employer's preelection conduct as it applied the *Gissel* standard to resolve the parties' dispute and issue a bargaining order.　*Id.* at *16 (finding it likely that the employer's "unlawful preelection misconduct" would have a lasting effect on future elections).　As it pertained to the case-specific facts and the contemporaneous adjudication, the new standard did not add any value to the *Cemex* Board's remedial responsibilities.　The *Cemex* Board even recognized this shortcoming, stating: "the application of the revised standard in this case results in neither finding any additional violation of the Act nor any additional remedial obligation."　*Id.* at *30.

The *Cemex* Board said the quiet part out loud, proclaiming that the value in the new standard was its deterrent effect on future, hypothetical preelection violations of the Act.　*Id.* at *26 ("In our view, the standard we announce today, by making remedial bargaining orders more readily available, will 'deter employer misbehavior' in the period before a Board election." (quoting *Gissel*, 395 U.S. at 614)).　And by fixating on the general deterrent effect of preelection conduct, the *Cemex* Board made clear that it created the new standard not as a case-specific means to provide a remedy to the parties (which would be a proper exercise of its adjudicatory authority under 29 U.S.C. § 160), but as a general rule it deemed "necessary to carry out the provisions of [the Act]" on a macro scale (which is a proper exercise of its rulemaking authority under 29 U.S.C. § 156).　*See, e.g.*, *id.* at *27 ("It is our considered view that our new standard will more effectively disincentivize employers from committing unfair labor practices prior to an election."); *id.* at *28 ("[R]equiring that employers who insist on an election do not frustrate a timely election by committing unfair labor practices addresses one of the greatest weaknesses of

*Gissel*: under the new standard, we expect that employers seeking an election will be incentivized *not* to commit unfair labor practices in response to a union campaign." (emphasis in original)); *id.* at *28 ("It is our judgment that the risks to an employer of a *Gissel* bargaining order, with its emphasis on whether a future, often second (or even third) election can be fairly conducted, has not served as an adequate deterrent to employer unfair labor practices during the election period.  Under current Board law, there is no effective remedy to deter an employer bent on defeating a union campaign by committing serious unfair labor practices that tend to make a free and fair election unlikely.").  The *Cemex* Board doubled down on this non-remedial, future-deterrence logic while denying the employer's motion for reconsideration.  *Cemex Constr. Materials Pac., LLC*, 372 NLRB No. 157, 2023 WL 7648946, at *4 n.19 (Nov. 13, 2023) ("*Cemex Motion to Reconsider*") ("As explained in the underlying decision, the Board believes that th[e] perverse incentive [to commit unfair labor practices interfering with an election] can and should be diminished by a modified standard that aims to mitigate delay-related harms to employees' statutory right[s] . . . .").

*          *          *

Looking no further than its own explanation, we conclude that the *Cemex* Board created the *Cemex* standard as a new rule of general applicability that did not adhere to the core limitation Congress placed on adjudicatory authority: the *Cemex* standard was not created as a means to resolve the parties' dispute or undo the effects of the parties' violative conduct.  This alone constitutes an improper use of the Board's adjudicatory authority.  Further, the *Cemex* standard was derived not from the facts of the adjudication before it, but from "[d]ecades of experience administering the *Gissel* standard" in other circumstances.  *Cemex*, 2023 WL 5506930, at *26.  And its framework extends well beyond a rule of marginal utility.  The rule provides a rigid, yet widely applicable, base: "[u]nder the new standard . . . if the Board finds that an employer has committed unfair labor practices that frustrate a free, fair, and timely election, the Board will dismiss the election petition and issue a bargaining order."  *Id.* at *28.  The intended flexibility of adjudication-based policymaking is lost where a standard imposes an extraordinary remedy—like a bargaining order—on employers through such a non-case-specific

hard-and-fast rule.  *Chenery II*, 332 U.S. at 202-03.  Thus, the *Cemex* Board exceeded its adjudicatory authority in creating the *Cemex* standard for issuing bargaining orders.

And if the substance of the *Cemex* Board's order left any doubt, the structure of the *Cemex* opinion makes clear that the new standard was rulemaking under the guise of an adjudication.  Section II.C of *Cemex* (titled "The *Gissel* Order") discusses "the continuing impact of the [employer's] past misconduct" and whether the employer "would likely meet a renewed organizing effort with further unfair labor practices tending to make a fair rerun election unlikely."  *Cemex*, 2023 WL 5506930, at *14.  The section concludes by wrapping the *Gissel* analysis in a neat bow, summarizing why the *Cemex* Board determined a *Gissel* "bargaining order is warranted, necessary, and appropriate."  *Id.* at *17.  Then, after a discussion about the statutory framework comes Section III.C (titled "New Standard"), which outlines the *Cemex* Board's decision to replace *Gissel*, *id.* at *24-28, and Section III.D (titled "Application and retroactivity"), which explains how to apply this new standard in future adjudications, *id.* at *28-30.  At its core, adjudication-based orders are supposed to serve the Board's remedial purposes.  But the *Cemex* Board's new, generally applicable standard was announced as a completely separate exercise from resolving the parties' dispute.  Just as the Supreme Court in *Wyman-Gordon* took issue with the *Excelsior* rule, we take issue with *Cemex*: to formulate such a general, forward-looking policy that does not serve its case-specific remedial responsibilities, the Board would need to use the rulemaking process.  29 U.S.C. § 156; *see also supra* note 2.

Predictably, in the case before us, the Board disagrees, declaring that this "new standard" served as an alternative holding in the *Cemex* Board's general remedial efforts.  Resp't Br. 53-54, D.38.  But the new standard was not an alternative holding.  True, after creating the new standard based on general observations and policy aims, the *Cemex* Board applied it retroactively to the facts of the case before it.  *Cemex*, 2023 WL 5506930, at *29.  But whether or not the Board can apply a new standard retroactively is a separate question we only ask once it has properly "announce[d] a new rule of law."  *See Fox Painting Co. v. NLRB*, 919 F.2d 53, 56 (6th Cir. 1990).

A post-hoc application of an improperly formulated standard does not fix the *Cemex* Board's unlawful exercise of adjudicatory authority.  The *Cemex* Board did not create the new

standard as an alternative ground to fashion a remedy for the case before it; the *Cemex* Board created the new standard only as a means to deter action that could be subject to future adjudications. The issue is not whether the *Cemex* standard *could* be applied to the case that was before the *Cemex* Board, or that it *could* deter future preelection conduct similar to Brown-Forman's unfair labor practices, *Cemex*, 2023 WL 5506930, at *27—in fact, in this context, the standard's broad utility accentuates why adjudication was not the proper process for its creation. The issue is that the *Cemex* Board created the standard for means unrelated to resolving the parties' dispute. And the Board must announce such policies in the Federal Register, not an adjudication. 29 U.S.C. § 156; 5 U.S.C. § 553; *see also Wyman-Gordon*, 394 U.S. at 763-64. A contrary conclusion would erase the congressionally imposed distinction between the Board's adjudicative and rulemaking functions and render the procedural limitations on its respective authorities toothless. Congress did not intend for the Board to have such unfettered adjudicatory authority. 29 U.S.C. §§ 156, 160; 5 U.S.C. § 551(4)-(7); *see also Bell Aerospace*, 416 U.S. at 294 (explaining that if the Board improperly relied on its adjudicatory authority it "would amount to an abuse of discretion or a violation of the Act"); *Allentown Mack*, 522 U.S. at 375 ("The evil of a decision that applies a standard other than the one it enunciates spreads in both directions, preventing both consistent application of the law by subordinate agency personnel (notably ALJ's), and effective review of the law by the courts.").

Importantly, however, even if the new *Cemex* standard constituted an alternative ground to issue a bargaining order in the *Cemex* adjudication, because the *Cemex* Board acknowledged that applying the contemporaneously binding *Gissel* standard led to the appropriate resolution of the parties' dispute (a bargaining order), the only purpose of the new standard was to deter future, hypothetical violations of the Act. *Cemex*, 2023 WL 5506930, at *27-28, *30. Our circuit has held that the Board does not have the authority to fashion remedies for this purpose. *Nat'l Cash Register Co. v. NLRB*, 466 F.2d 945, 968 (6th Cir. 1972) ("The Board does not have broad authority to impose sanctions solely for the purpose of deterring future violations of the Act." (citing *Republic Steel*, 311 U.S. at 11-12)); *see also supra* note 7 (explaining that the Board cannot use its adjudicatory authority to deter hypothetical, future conduct from employers not subject to the adjudication).

By invalidating the *Cemex* standard as an improper exercise of the Board's adjudicatory authority, we continue the linear development of *Chenery II* and its progeny by limiting the Board's adjudicative orders to remedying the dispute of the parties before the Board.**[8]** To be clear, there is typically room for the Board to create a policy of marginal utility as it fashions a case-specific remedy. *Bell Aerospace*, 416 U.S. at 294. But the Board did not take that approach in *Cemex*. It is not the Board's general power to make policy through adjudication at issue here, only how the Board improperly used its adjudicatory authority as it attempted to promulgate the *Cemex* standard.

The rarity with which courts invalidate the Board's adjudication-based policies reflects nothing more than the Board's typical respect for the statutorily imposed limitations on its authority.**[9]** Looking at the Board's historical use of its adjudicatory authority, its adherence to proper procedure is clear: when the Board has shifted or modified its standards, it does so in furtherance of resolving the parties' dispute. *See, e.g.*, *Joy Silk Mills, Inc.*, 85 NLRB 1263, 1264-65 & n.5 (modifying the applicable standard to accommodate the "nature and timing" of the unfair labor practices at issue "[i]n the instant case"); *Snow & Sons*, 134 NLRB 709, 710-11 (1961) (determining that the facts of the case before it were distinguishable from *Joy Silk* and thus warranted a different, case-specific analysis); *Aaron Bros. Co.*, 158 NLRB at 1080 (evaluating the facts of the case to determine that the employer did not "engage in any contemporaneous misconduct," so the employer's "insistence upon an election to establish the Union's majority was [not] improperly motivated"); *Linden Lumber Div.*, 190 NLRB 718, 720 (1971) ("The resolution of the instant proceeding now requires the Board to face and decide . . .

---

**[8]**The dissent "see[s] something totally different" in this line of precedent, looking to a surface-level "score" based only on the outcomes of these cases. However, this "score" is of little value; the dissent fails to grapple with (1) the principles that guide the decisions, and (2) the distinctions between the Board's previous adjudications that adhered to those principles (*infra* next paragraph) and *Cemex* (which did not). The dissent's approach is made possible by turning a blind eye to the Supreme Court's repeated reiteration of the guardrails that limit adjudicatory authority. The dissent sees only an endorsement of the Board's power to make policy through adjudication. But the Supreme Court was not wasting ink as it outlined the constraints that Congress imposed on the Board's use of adjudication to form policies. *See, e.g.*, *Wyman-Gordon*, 394 U.S. at 763-66; *Bell Aerospace*, 416 U.S. at 292-94 (referencing *Chenery II*, 332 U.S. at 201-03).

**[9]**The Board has often chosen to use its adjudicatory powers to make case-specific, precedent-setting policy, as it has the authority to do. *See Allentown Mack*, 522 U.S. at 374. However, recently, the Board has increasingly engaged in formal rulemaking. *See, e.g.*, Joint Employer Status Under the National Labor Relations Act, 88 Fed. Reg. 73946 (Oct. 27, 2023); Representation Case Procedures, 88 Fed. Reg. 58076 (Aug. 25, 2023).

whether, absent election interference, an employer who insists on an election must initiate the election by his own petition."). The Board and the dissent present no cases indicating otherwise and instead rely solely on the notion that adjudication in the past endorses all adjudication in the future. But when Congress imposes limitations on an agency's adjudicatory authority, a closer look at the exercise of that authority is required. And *Cemex* stands out as an anomaly that, unlike the Board's previous bargaining-order decisions, attempts to make a general rule that is not case-specific and does not further the resolution of the parties' dispute.[10] We have no hesitation to check the Board when it exceeds its delegated authority, just as we have no hesitation to let stand decisions that adhere to the limits Congress imposed.

Despite the Board's best efforts to minimize the novelty of creating a new, adjudication-based standard that did not resolve the parties' dispute, *Cemex* was an exception, crossing the boundaries of adjudicatory authority. In its briefing in the matter before us, the Board invokes arguments from the *Cemex* opinion to justify the *Cemex* Board's procedure in creating this new bargaining order standard. Resp't Br. 53-54, D.38. But they all fall short.

First, the Board cited *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), to assert that "[t]he Supreme Court has long recognized the Board's authority to change national labor policy through adjudication by adopting alternative permissible interpretations of the Act." *Cemex*, 2023 WL 5506930, at *30; *see also Cemex Motion to Reconsider*, 2023 WL 7648946, at *3-4. But setting aside whether the Board's self-described "permissible interpretation[] of the Act" can support a new standard,[11] *J. Weingarten* only reinforces the notion that adjudication is

---

[10]It is telling that the dissent chooses not to address the substantive elements of *Cemex* that make evident the *Cemex* Board's improper use of adjudicatory authority (e.g., the *Cemex* Board's application and endorsement of *Gissel* as the appropriate standard to resolve the parties' dispute before creating a new, general rule for future adjudications; the *Cemex* Board's improper pursuit of an adjudication-based policy that focuses on deterring non-case-specific conduct; the lack of remedial effect that the *Cemex* standard had on the parties' dispute; etc.). Instead, the dissent suggests that the Board's adjudicatory policymaking powers are boundless so long as the adjudication resembles an adversarial proceeding. But such a holding would endorse rulemaking through adjudication, contravene our binding precedent, and disturb Congress's careful delegation of power to the Board that establishes parameters controlling how the Board uses its distinct adjudicatory and rulemaking powers.

[11]While we start and end our analysis with the Board's improper exercise of its adjudicatory authority, we question whether the *Cemex* standard is consistent with the longstanding preference for elections to measure union support. *Gissel*, 395 U.S. at 602. Whether the Board's "permissible" interpretation of the Act from *Cemex* can stand, even if properly promulgated, is a question we leave for another day. *See Loper Bright*, 603 U.S. at 400 ("It . . . makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant

appropriate "where 'the nature of the problem, as revealed by unfolding variant situations, inevitably involves an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer.'" 420 U.S. at 265 (cleaned up) (quoting *Elec. Workers v. NLRB*, 366 U.S. 667, 674 (1961)). *Cemex* violated the central principle of *J. Weingarten* by creating a quick, definitive formula for bargaining orders: "if the Board finds that an employer has committed unfair labor practices that frustrate a free, fair, and timely election, the Board *will* dismiss the election petition and issue a bargaining order." 2023 WL 5506930, at *28 (emphasis added). There is no case-specific nuance to a standard that makes bargaining orders the default for situations in which an election is set aside. Additionally, this argument fails to address the crux of the issue—the *Cemex* standard needed to be case-specific and remedial in nature. It was neither.

Second, the Board tried to justify its process in *Cemex* by declaring that it can draw upon its general experience—rather than the facts of the case—to fashion an appropriate remedy. *Id.* at *24 n.137. It cited *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953), in purported support. But, in doing so, the Board mischaracterized the holding of that case. In *Seven-Up*, the Supreme Court held that "[i]n devising a remedy[,] the Board is not confined to the record of a particular proceeding." 344 U.S. at 349. But this refers to remedial orders directed at a specific party that has violated the Act; the principle only applies to "fashioning remedies [that] undo the effects of violations of the Act"—the baseline remedial order authority under 29 U.S.C. § 160. *Id.* at 346. In theory, the Board is best positioned to use its experience (beyond the record of the parties' dispute) to fashion a specific remedy that will best return the parties to their respective starting positions were there no violations of the Act. But, as discussed above, the *Cemex* standard was not designed as a specific remedy to undo the effects of the parties' violations of the Act—the *Cemex* standard was designed to generally deter potentially malfeasant employers from committing future, hypothetical violations. *Cemex*, 2023 WL 5506930, at *27-28. Such a purpose extends beyond the Board's remedial authority. *Republic Steel*, 311 U.S. at 12 ("[I]t is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is

interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.").

sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.").

Finally, the Board attempted to justify its new standard by asserting that "[h]istorically, the Board has modified policies through adjudication, including in cases in which the change in standard has not changed the result for the respondent in the case." *Cemex*, 2023 WL 5506930, at \*30. It cited *Alstate Maintenance, LLC*, 367 NLRB No. 68, 2019 WL 183862 (2019), but once again extracted an inapplicable principle. In *Alstate*, the modification to the standard did not change the ultimate outcome, but the modification was still prompted by the nuances of the specific facts, designed to better adjudicate the parties' particular dispute because the previous standard was insufficient. *Id.* at \*3. The *Cemex* standard was not created to better adjudicate the parties' particular dispute, contravening the core limitation on the Board's adjudicatory authority.

*Alstate* does not provide a defense for the Board's conduct in *Cemex*, nor does other caselaw. That is because the *Cemex* standard did not further the Board's remedial responsibilities—the core of its adjudicatory authority. Instead, the *Cemex* standard was a rule of general applicability that the Board deemed necessary to carry out its preferred administration of the Act—derived not from the facts of the case that was before the Board, but from decades of observing employer conduct in the labor relations realm. It is precisely the type of rule that fits under the Board's rulemaking power, *see* 29 U.S.C. § 156, rather than its adjudicatory power, *see* 29 U.S.C. § 160. Thus, because the way in which the Board created the *Cemex* standard constituted an improper exercise of its statutory authority, the *Cemex* bargaining order standard is invalid. *Wages & White Lion Invs.*, 604 U.S. at 587 ("[We use] the now-bedrock principle that an agency action cannot stand 'unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.'" (quoting *Chenery I*, 318 U.S. at 95)).

**4. The Bargaining Order Issued Against Brown-Forman Cannot Be Enforced**

Our review now turns to whether the Board's bargaining order in *Brown-Forman* can be sustained. It cannot. To issue a bargaining order forcing Brown-Forman to recognize and

negotiate with the union, the Board relied solely on the Administrative Law Judge's analysis under *Cemex. Brown-Forman Corp.*, 373 NLRB 145 slip op. at \*1 n.4.  As discussed, the *Cemex* standard was an improper exercise of the Board's adjudicatory authority that cannot serve as the basis of a remedial order; it has no precedential value.  And because the Board did not fix the procedural transgressions of *Cemex*[12] in adjudicating *Brown-Forman*—at no point did the Board use the case-specific facts to establish this standard as the proper analytical framework to better resolve the parties' dispute—the Board applied a new standard without sufficient justification, violating the principles of "reasoned decisionmaking."  *Allentown Mack*, 522 U.S. at 374.  Thus, we cannot enforce the Board's order against Brown-Forman.  *See id.*  Accordingly, we remand the matter to the Board to analyze this case consistent with its statutory authority.  *Wages & White Lion Invs.*, 604 U.S. at 587 ("[T]he better course when an agency error is identified is for the reviewing court, 'except in rare circumstances,' 'to remand to the agency for additional investigation or explanation.'" (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985))).

## IV. CONCLUSION

For the reasons discussed herein, we **GRANT** Brown-Forman's petition for review, **DENY** the Board's cross-petition for enforcement, and **REMAND** for proceedings consistent with this Opinion.

---

[12]We do not reach any potential substantive shortcomings of the *Cemex* standard.  *See supra* note 11.

---

**DISSENT**

---

MATHIS, Circuit Judge, dissenting.  The National Labor Relations Board changes its policies all the time.  And the Board is notorious for switching its standards back and forth.  But through it all, the Board has confidently stood on one bedrock principle: it has the authority, with limited exceptions, to choose how to create and change its own policies.  This authority comes from the National Labor Relations Act and the Administrative Procedure Act, as confirmed by the Supreme Court.  For over 50 years, "the choice between rulemaking and adjudication [has lain] in the first instance within the Board's discretion."  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974).  The majority opinion suggests that the choice lies in the first instance with the Sixth Circuit.

In *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130 (Aug. 25, 2023), the Board made a policy change.  It changed its standard for determining when an employer's bargaining obligation with a union attaches, and it limited an employer's ability to delay recognition of a union when the union can show (through authorization cards) that a majority of workers in the proposed bargaining unit favor the union.  The Board also changed its standard for issuing a bargaining order to remedy an employer's commission of unfair labor practices sufficient to destroy the integrity of a representation election.  The Board's creation of these policy changes through adjudication was not novel—its standards have always evolved in adjudicatory proceedings.

Enter Brown-Forman Corporation.  The production workers at one of Brown-Forman's distilleries were unsatisfied with their paycheck, so they reached out to the International Brotherhood of Teamsters, Local 651 ("the Union"), to help them negotiate better wages.  The Union collected authorization cards from a majority of workers in the proposed bargaining unit, and it petitioned the Board for a representation election.

When Brown-Forman learned that its workers were organizing, it increased their wages by $4 per hour and gave them a variety of other benefits.  The Union lost the election and filed

unfair-labor-practice charges against Brown-Forman.  The Board sustained the charges, set aside the election, and ordered Brown-Forman to bargain with the Union under the new *Cemex* standard.

I would enforce the Board's order and deny Brown-Forman's petition for review.  The APA did not require the Board to promulgate its new standard through notice-and-comment rulemaking.  The Board properly adjudicated this standard to resolve the dispute in *Cemex*.  The Board supported its change in policy with reasoned decisionmaking based on the facts before it and its experience administering the NLRA, as the APA required it to do.  And the standard itself is consistent with both Supreme Court precedent and the NLRA.  It would not be manifestly unjust to apply this new standard retroactively to Brown-Forman because the company cannot show that it relied to its detriment on past policy—no past policy allowed it to coerce its employees into abandoning their choice to collectively bargain.

The majority reaches a different result by "exalt[ing] form over [administrative] necessity."  *NLRB v. Chenery Corp.*, 332 U.S. 194, 202 (1947).  I respectfully dissent.

## I.

Brown-Forman is one of the largest bourbon whiskey producers in the country.  Its facilities distill and bottle whiskeys like Old Forester, Jack Daniels, and Woodford Reserve.  The workers at the Woodford Reserve Distillery ("Woodford") paved the way for this labor dispute.

Brown-Forman paid its Woodford workers substantially less than workers at competitor distilleries.  The company increased its wages by $1 per hour in May 2022, but that did little to bridge the wage gap—its workers wanted more.  Brown-Forman refused, so the Woodford production workers contacted the Union to help them negotiate.

The Union distributed authorization cards in July 2022.  By October 8, 2022, a majority of the production workers had authorized the Union to represent them.

After the Union achieved card-based majority status, it petitioned the Board for an election and attached copies of the signed authorization cards.  The Union also provided proof of its majority status to Woodford's plant director and requested recognition as the production

workers' collective-bargaining representative.  Brown-Forman refused to recognize the Union as the workers' representative based solely on the authorization cards.

Instead, Brown-Forman waged a campaign of unfair labor practices that worked with surgical precision.  The company rushed to announce a $4 per hour across-the-board wage increase at Woodford, which was unprecedented in its sum, its breadth, and its timing.  The pay increase hit employees' bank accounts a week before the representation election.  Brown-Forman also changed its pay-progression policy so that newly hired and promoted employees could receive raises sooner, and it changed its vacation policy so that employees did not have to use their personal time during the annual end-of-year operational shutdown.  To top it off, Brown-Forman plied its workers with alcohol, passing out bonus bottles of bourbon to its production workers right before the vote.

The Union immediately felt the chilling effects of Brown-Forman's actions.  Some workers stopped speaking to Union representatives.  One employee said he was taking "the bribe."  A.R. 298.  Another asked for his authorization card back—the "raise put [him] back on the fence."  D. 14-4 at p.75.  Workers were "backing down."  *Id.* at 79.  These newly satisfied employees voted down the Union by a 45-to-14 margin.

The Union objected to the election and filed unfair-labor-practice charges against Brown-Forman.  The Board's General Counsel issued a consolidated complaint alleging that Brown-Forman: (1) violated § 8(a)(1) of the NLRA when it announced the decision to increase wages by $4 per hour; (2) violated § 8(a)(1) and (3) when it granted the raise, changed the pay-progression plan, modified its vacation policy, and gifted bottles of bourbon; and (3) violated § 8(a)(5) when it refused to bargain with the Union, despite evidence of its majority status, to buy time to undermine the impending election.

The Board ruled against Brown-Forman.  It upheld the administrative law judge's conclusions that Brown-Forman engaged in unfair labor practices by giving workers a wage adjustment and other benefits to discourage them from voting to join the Union.  *Brown-Forman Corp.*, 373 NLRB No. 145, slip op. at 1 (Dec. 16, 2024).  As a remedy for Brown-Forman's

violations, the Board ordered Brown-Forman to bargain with the Union under *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130 (Aug. 25, 2023).

I agree with the majority opinion that substantial evidence shows that Brown-Forman engaged in unfair labor practices.  But the majority opinion rejects the Board's chosen remedy, so I turn to that issue.

## II.

Congress has empowered the Board to "take such affirmative action . . . as will effectuate the policies of th[e] [NLRA]."  29 U.S.C. § 160(c).  This provision "charges the Board with the task of devising remedies to effectuate [those] policies."  *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) (quotation omitted).  And it equips the Board with "broad discretionary" authority to remedy unfair labor practices.  *Id.*

The Board's remedial authority is "subject to limited judicial review," *id.*, as "[i]t is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged," *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944) (quotation omitted).  To that end, a remedial order from the Board "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the" NLRA.  *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943).

Here, the Board imposed a bargaining order.  A bargaining order, as its name suggests, forces an employer to bargain with a union that possessed majority support, even if the union failed to retain its majority status in a representation election.  *Franks Bros.*, 321 U.S. at 704–05. Since the early days of the NLRA, the Supreme Court has approved the Board's issuance of remedial bargaining orders under its § 10(c) authority "without first requiring the union to show that it has been able to maintain its majority status."  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610 (1969); *see also NLRB v. P. Lorillard Co.*, 314 U.S. 512, 513 (1942) (per curiam).  The Board's authority to issue this kind of bargaining order "seems too plain for anything but statement."  *Franks Bros.*, 321 U.S. at 705.

Brown-Forman does not—and cannot—argue to the contrary. Instead, it argues that the Board did not have the authority to issue a bargaining order under *these* circumstances. So what kind of circumstances have historically sustained a bargaining order as a remedy for an unfair-labor-practice violation? I turn to that next.

## III.

When the Board issues a bargaining order, it does so to balance several NLRA precepts. Section 9(a) of the NLRA provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining." 29 U.S.C. § 159(a). It is an unfair labor practice for an employer to refuse to bargain with those representatives. *Id.* § 158(a)(5).

But the NLRA does not specify *when* an employer incurs a bargaining obligation. Section 9(a) "says nothing as to how the employees' representative shall be chosen." *Gissel*, 395 U.S. at 597 (quotation omitted). Section 9(c) identifies one method—an interested party can petition for an election "by secret ballot" and the Board must "certify the results thereof." 29 U.S.C. § 159(c)(1). That is the preferred method. *Gissel*, 395 U.S. at 602. But it is not the only method. In fact, the Board has repeatedly vacillated on the requirements necessary for the attachment of a bargaining obligation under § 9(a) absent post-election certification.

Start with *Joy Silk Mills, Inc.* 85 NLRB 1263 (1949), *enforced*, 185 F.2d 732 (D.C. Cir. 1950). There, the Board held that employees could select a union representative under § 9(a) by signing and submitting cards authorizing the union to represent them. *Id.* at 1264. An employer incurred a corresponding obligation to bargain with that union unless it had a "*bona fide* doubt as to the union's majority." *Id.* (quotation omitted). So it could not refuse to bargain based on authorization cards "without a valid ground." *Snow & Sons*, 134 NLRB 709, 710–11 (1961), *enforced*, 308 F.2d 687 (9th Cir. 1962). To determine whether the employer's doubt was sincere, the Board considered "all relevant facts in the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct." *Joy Silk*, 85 NLRB at 1264. An employer's commission of unfair labor practices

during the pre-election period usually indicated a lack of good faith, in which case the Board would issue a bargaining order. *Id.* at 1264–65.

Years later, the Board modified the *Joy Silk* standard. In *Aaron Brothers Co.*, the Board put the burden on the General Counsel to "affirmatively establish" that an employer acted in bad faith when it refused to bargain based on a union establishing majority support by authorization cards. 158 NLRB 1077, 1078–79 (1966). Under this standard, an employer did not violate its bargaining obligation by "refus[ing] to rely upon cards, rather than an election, as the method for determining the union's majority." *Id.* at 1078. With this modification, not every unfair labor practice would result in a finding of bad faith sufficient to warrant a bargaining order, and employers no longer needed a reason to reject card-based authorization. *Gissel*, 395 U.S. at 593.

The Supreme Court waded into this conversation in *Gissel*. The Court granted certiorari to address whether signed authorization cards could form a valid basis for establishing a union's majority status. *Id.* at 579. At oral argument, however, the Board announced that it had "abandoned" the *Joy Silk* standard and asked the Court "to approve its current practice" of issuing a bargaining order when an employer's refusal to bargain based on cards coincided with its commission of unfair labor practices. *Id.* at 591, 594. So the Court also addressed "whether a bargaining order is an appropriate and authorized remedy where an employer rejects a card majority while at the same time committing unfair practices that tend to undermine the union's majority and make a fair election an unlikely possibility." *Id.* at 579.

Under the Board's new approach, "the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election." *Id.* at 594. The employer need not give any affirmative reason "for rejecting a recognition request." *Id.* And the employer could require the union to hold an election before agreeing to bargain, "regardless of [its] subjective motivation, so long as [it] is not guilty of misconduct" that would preclude a fair election. *Id.*

In answering the first question, the Court agreed with the Board that a union could prove majority status "by possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes." *Id.* at 597. Still, the Court

acknowledged that "secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support." *Id.* at 602.

The *Gissel* Court went on to answer the second question. The Court approved the Board's new approach as a proper exercise of its discretion. *Id.* at 610–16. As the Court reaffirmed, the Board has the authority to order an employer to bargain with a union "even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered." *Id.* at 610.

*Gissel* established boundaries around the Board's power to issue a bargaining order to remedy an employer's unfair labor practices that undermine union support before an election. The Court identified three categories of unfair labor practices and explained whether those practices could justify remedial bargaining orders. *Id.* at 613–15.

The first category includes unfair labor practices that are "outrageous and pervasive." *Id.* at 613 (citation modified). These kinds of practices eliminate the possibility of conducting a fair election. *Id.* at 613–14. A bargaining order is appropriate in this situation when it is "the only available, effective remedy for substantial unfair labor practices." *Id.* at 614.

The second category includes "less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* The Court approved the Board issuing a bargaining order to remedy these less pervasive practices "[i]f the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies . . . is slight and that employee sentiment once expressed through cards would . . . be better protected by a bargaining order." *Id.* at 614–15.

The third category includes "minor or less extensive unfair labor practices" that have "minimal impact on the election machinery." *Id.* at 615. The Court emphasized that these kinds of practices "will not sustain a bargaining order." *Id.*

The Court did not address "whether a bargaining order is ever appropriate in cases where there is no interference with the election processes." *Id.* at 595.

After *Gissel*, the Board formally renounced *Joy Silk* when it decided *Linden Lumber Division, Summer & Co.* There, the Board highlighted the difficulties in "attempting to divine, in retrospect, the state of employer (a) knowledge and (b) intent at the time he refuses to accede to a union demand for recognition." *Linden Lumber Div., Summer & Co.*, 190 NLRB 718, 720 (1971), *aff'd*, 419 U.S. 301 (1974). The Board also answered the question that *Gissel* declined to address: it held that an employer does not commit an unfair labor practice "solely upon the basis of its refusal to accept evidence of majority status other than the results of a Board election." *Id.* at 721. Thus, an employer's refusal to bargain with a union that claims majority support based on authorization cards would not qualify as a violation of § 8(a)(5) unless it was accompanied by independent unfair labor practices designed to undermine an election.

The Court approved the Board's decision. It noted that "[i]n light of the statutory scheme and the practical administrative procedural questions involved, we cannot say that the Board's decision that the union should go forward and ask for an election on the employer's refusal to recognize the authorization cards was arbitrary and capricious or an abuse of discretion." *Linden Lumber*, 419 U.S. at 309–10.

The Board applied the *Linden Lumber* standard for more than 50 years—until it again changed directions in *Cemex*. In *Cemex*, the General Counsel asked the Board to overrule its *Linden Lumber* decision and reinstate a modified version of the *Joy Silk* standard. 372 NLRB No. 130, slip op. at 2. The Board found the General Counsel's arguments meritorious and overruled *Linden Lumber*, concluding "that the current scheme for remedying unlawful failures to recognize and bargain with employees' designated bargaining representatives is inadequate to safeguard the fundamental right to organize and bargain collectively." *Id.* at 24.

What is the new standard under *Cemex*? The Board held that an employer violates § 8(a)(5) "by refusing to recognize, upon request, a union" possessing authorization cards from "the majority of employees in an appropriate unit unless the employer promptly files a petition pursuant to Section 9(c)(1)(B) of the [NLRA] . . . to test the union's majority status or the appropriateness of the unit, assuming that the union has not already filed a petition." *Id.* at 25. Because it overruled *Linden Lumber*, the Board also clarified that it would "no longer look to *Gissel* bargaining orders." *Id.* at 26. Instead, "if the employer commits an unfair labor practice

that requires setting aside the election, the petition (whether filed by the employer or the union) will be dismissed, and the employer will be subject to a remedial bargaining order." *Id.*

In this case, the Board issued a remedial bargaining order under *Cemex*. *Brown-Forman*, 373 NLRB No. 145, slip op. at 1–2 & n.4. It did so after concluding that Brown-Forman's actions of granting wage increases and other benefits were significant unfair labor practices that undermined the organizing campaign and the election, warranting a bargaining order. *Id.* at 1.

## IV.

Brown-Forman challenges the *Cemex* bargaining order in three ways. It asserts that: (1) the Board improperly created the *Cemex* standard through adjudication rather than notice-and-comment rulemaking; (2) the *Cemex* standard conflicts with *Gissel*; and (3) the Board should not have applied *Cemex* retroactively.[1] Its arguments lack merit.

## A.

I start with Brown-Forman's adjudication-vs.-rulemaking argument. Congress gave the Board "the authority to develop and apply fundamental national labor policy." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500 (1978). The NLRA did not undertake "the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945). Instead, Congress gave that job to the Board. *Id.* So the Board has the "authority to formulate rules to fill the interstices of the [NLRA's] broad statutory provisions." *Beth Israel*, 437 U.S. at 500–01.

Congress empowered the Board to make policy in two different ways. The Board can either adjudicate policy on a case-by-case basis, 29 U.S.C. § 160, or promulgate it through notice-and-comment rulemaking, *id.* § 156.

---

[1]Brown-Forman also asserts that *Cemex* violates the Court's interpretation of the NLRA in *Linden Lumber* by putting a burden on the employer to petition for an election (if the union has not already done so) before it can lawfully refuse to bargain. Like the majority, I conclude that the substance of this portion of the *Cemex* standard is not properly before us—the Union petitioned for an election at the same time it requested to bargain. Brown-Forman was never required to petition for an election, and the Board did not predicate its finding that the company violated § 8(a)(5) on the fact that it refused to bargain without simultaneously exercising its right to petition for an election.

The APA governs rulemaking and adjudication. 5 U.S.C. §§ 553, 554. Rulemaking results in the formulation, amendment, or repeal of a "rule." *Id.* § 551(5). The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). By contrast, an adjudication is the process of formulating an "order." *Id.* § 551(7). An order is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." *Id.* § 551(6).

Rules and adjudications are different in kind. Rules are generally applicable principles designed to "fit all cases at all times." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292 (1974). They do not depend on fact-specific determinations, so they do not change case by case. *SEC v. Chenery Corp. (Chenery II)*, 332 U.S. 194, 202–03 (1947). "Rules are more legislative in nature and have general applicability." *R/T 182, LLC v. FAA*, 519 F.3d 307, 310 (6th Cir. 2008) (citation modified). And they "have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J., concurring).

Adjudications create policy through precedents established in "individual, ad hoc litigation." *Chenery II*, 332 U.S. at 203. Precedent is developed over time on a case-by-case basis, and the Board's adjudicatory policies are "adjusted to meet particular, unforeseeable situations." *Id.* at 202. "Adjudication . . . has future as well as past legal consequences, since the principles announced in an adjudication cannot be departed from in future adjudications without reason." *Bowen*, 488 U.S. at 216–17 (1988) (Scalia, J., concurring).

When Congress gives an administrative agency both rulemaking and adjudicative authority, the agency gets to decide which to use. *Chenery II*, 332 U.S. at 201–02. Because the Board has both types of authority, "the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." *Bell Aerospace*, 416 U.S. at 294. The Board's decision to use adjudication rather than rulemaking "is entitled to great weight." *Id.* Courts should uphold "the Board's reliance on adjudication" unless it "would amount to an abuse of discretion or a violation of the" NLRA. *Id.* That said, "since *Bell Aerospace* the Court has not even suggested that a court can constrain an agency's choice between rulemaking and

adjudication."  *Velasco-Giron v. Holder*, 773 F.3d 774, 779 (7th Cir. 2014) (Easterbrook, J.) (citation modified).

The Board is an "expert in federal national labor relations policy."  *Beth Israel*, 437 U.S. at 501; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 357 (2024) (Jackson, J., concurring) ("Congress created an expert agency, the National Labor Relations Board, to investigate, adjudicate, and stop unfair labor practices.").  And this expert agency has decided to develop most of its policy through adjudication.  In fact, the Board "has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  That remains true to this day.

The Board "may announce new principles that will guide future action in an adjudicative proceeding."  *R/T 182*, 519 F.3d at 310; *Bell Aerospace*, 416 U.S. at 294.  When creating new policy through adjudication, the Board must engage in "reasoned decisionmaking."  *Allentown*, 522 U.S. at 374.  Reasoned decisionmaking demands that the Board "apply in fact the clearly understood legal standards that it enunciates in principle."  *Id.* at 376.  To that end, "[t]he Board treats its precedents as binding if and until a new majority of the Board deems a precedent incorrect."  *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 256 (5th Cir. 2024).

When the creation of policy through adjudication leads the Board to overturn its precedent, the Board must "provide reasoned explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The explanation must indicate the Board is aware that it is changing its position and provide "good reasons for the new policy."  *Id.*  Of course, the new policy must also be consistent with the NLRA.  *See id.*

Considering these principles, the Board properly exercised its policymaking authority when it adjudicated the *Cemex* standard.  The Board considered the General Counsel's request to change the bargaining-order standard and Cemex's response in opposition.  *Cemex*, 372 NLRB No. 130, slip op. at 24.  It contemplated the rights at issue and its congressionally mandated responsibility to protect those rights by fashioning remedies sufficient to safeguard them.  *Id.* at 24–38.  And it relied on its experience administering the NLRA in general and the facts of the case before it in coming to its conclusion.  *Id.*  Ultimately, the Board determined that its past

practice of permitting employers to refuse to bargain under *Linder Lumber* cracked open a door to coercion that employers kicked off its hinges. *Id.*

In response to these considerations, the Board overruled *Linden Lumber*, fashioned a remedy that it believed would better protect employees' rights under the NLRA, and applied that new remedial standard to Cemex. *Id.* Essentially, the Board moved closer to returning to its *Joy Silk* standard.

The *Cemex* order bears all the hallmarks of a proper adjudication. *See R/T 182*, 519 F.3d at 310 (concluding that a proceeding before the Federal Aviation Administration was an adjudication where "[t]he process was initiated by a complaint," the FAA found against the losing party in a written decision, the decision applied to the parties named in the complaint, and the losing party was allowed to appeal). Notably, the Board has developed the *Cemex* standard and its former iterations (*Joy Silk*, *Snow & Sons*, *Aaron Brothers*, *Gissel*, *Linden Lumber*) in adjudicatory proceedings. The reversal of an adjudicatory policy in a subsequent adjudication is "particularly appropriate." *Chisholm v. FCC*, 538 F.2d 349, 365 (D.C. Cir. 1976). As one of our colleagues has mentioned, "the NLRB has overturned itself repeatedly, sometimes even overturning past decisions overturning itself." *Teamsters Loc. Union No. 1199 v. Coca-Cola Consol., Inc.*, 854 F. App'x 675, 681 & n.1 (6th Cir. 2021) (Nalbandian, J., dissenting) (collecting cases).

The Board reasoned that its "application of the new standard to different facts in future cases will refine its contours in an evolutionary process that could not be achieved through notice-and-comment rulemaking." *Cemex Constr. Materials Pac., LLC*, 372 NLRB No. 157, slip op. at 4 (Nov. 13, 2023). This determination "is entitled to great weight." *Bell Aerospace*, 416 U.S. at 294. Because we are bound by Supreme Court precedent, we *must* give weight to the Board's determination that adjudication best suited its policymaking needs.

The Board checked all the boxes necessary in announcing its change in policy in *Cemex*.

First, the Board engaged in reasoned decisionmaking. Its original analysis spans some 40 pages, including its response to the arguments raised by the Board's dissenting colleague. *Cemex*, 372 NLRB No. 130, slip op. at 1–41. And it dedicated seven more pages to the issue in

response to Cemex's motion for reconsideration.  *Cemex*, 372 NLRB No. 157, slip op. at 1–7.
(Interestingly, although the dissenter in *Cemex* raised many arguments against the new standard,
he never suggested that the Board needed to engage in rulemaking to adopt it.)  The Board
acknowledged that it was overruling *Linden Lumber* and provided what it believed to be good
reasons for its decision to do so.  *Cemex*, 372 NLRB No. 130, slip op. at 24–28.  It "f[ound] that
the current scheme for remedying unlawful failures to recognize and bargain with employees'
designated bargaining representatives is inadequate to safeguard the fundamental right to
organize and bargain collectively that [the NLRA] enshrines."  *Id.* at 24.

Second, the *Cemex* standard is consistent with the Board's authority to remedy violations
of the NLRA.  The NLRA allows the Board "to take such affirmative action . . . as will
effectuate" the NLRA's policies.  29 U.S.C. § 160(c).  And the Supreme Court has "long held
that the Board . . . has the authority to issue a bargaining order without first requiring the union
to show that it has been able to maintain its majority status."  *Gissel*, 395 U.S. at 610.

Finally, the Board applied the newly adopted standard to the facts and circumstances in
*Cemex*.  *Cemex*, 372 NLRB No. 130, slip op. at 29–30.

The majority characterizes the Board's formulation of the *Cemex* bargaining order as
rulemaking disguised as adjudication.  And because the Board did not follow the APA's process
to promulgate a rule, *see NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality
opinion); 5 U.S.C. § 553, the majority declines to enforce the bargaining order.  The majority's
reasoning is misguided.  I explain why below.

**1.**

The majority (and Brown-Forman) invokes *Loper Bright Enterprises v. Raimondo* to
suggest that the Board improperly created new principles in *Cemex*.  603 U.S. 369 (2024).  *Loper
Bright* held that courts "may not defer to an agency interpretation of the law simply because a
statute is ambiguous."  *Id.* at 413.  Instead, "[c]ourts must exercise their independent judgment in
deciding whether an agency has acted within its statutory authority."  *Id.* at 412.

True, this court no longer defers to the Board's interpretations of the NLRA. *Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 528 (6th Cir. 2024).  But the Board's power to choose a vehicle for its policies does not come from its own interpretation of an ambiguous NLRA provision—it comes from Congress's explicit delegation of policymaking authority and the Court's consistent interpretation of this constitutionally permissible delegation as bestowing broad, discretionary power.  *See Chenery II*, 332 U.S. at 200–03.  *Loper Bright* tells us that we "must respect th[at] delegation, while ensuring that the agency acts within it."  603 U.S. at 413.  In that respect, *Loper Bright* simply reaffirms what we have always done.  *Id.* at 395.

I cannot say it better than Judge Katsas: "It would blink reality to suppose that *Loper Bright* will eliminate the NLRB's ability to conduct policymaking through adjudication."  *Harris v. Bessent*, 160 F.4th 1235, 1252 (D.C. Cir. 2025) (citation modified).

**2.**

The majority also misreads a trio of Supreme Court cases as cabining the Board's ability to create new policies and principles through adjudication.  Quite to the contrary, those cases endorse the Board's authority to choose between rulemaking or adjudication.

Start with *Chenery II*.  There, the Court upheld an agency's order adopting and applying a new principle.  *Chenery II*, 332 U.S. at 207.  As the Court concluded, an agency has the power to create policy through either the rulemaking process or an adjudicatory proceeding, so long as Congress gave the agency the power to do both.  *Id.* at 200–03.  When agencies have the power to choose, they are given wide latitude to pick the method that best suits their needs.  *Id.*  Any "rigid requirement" would otherwise "make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise."  *Id.* at 202.  The Court reasoned:

> Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule.  Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations.  In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order.  To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

*Id.* "There is thus a very definite place for the case-by-case evolution of statutory standards." *Id.* at 203.

The Court reaffirmed these principles in *NLRB v. Wyman-Gordon Co.* 394 U.S. at 766 (plurality opinion). In that case, the Board ordered Wyman-Gordon to provide the union with a list of its employees' names and addresses to facilitate union outreach before the representation election, consistent with its *Excelsior* order. *Id.* at 761–62. In the *Excelsior* proceeding, the Board established the names-and-addresses policy, but it did not apply the policy to the employer—the new policy applied only prospectively. *Id.* at 762–63.

Because the Board did not apply the principles it announced in *Excelsior* to the employer in that case, the Court concluded that the *Excelsior* order unlawfully established a rule in contravention of the APA's notice-and-comment requirements. *Id.* at 763–66; *id.* at 775–80 (Douglas, J., dissenting); *id.* at 780–83 (Harlan, J., dissenting). Still, the Court upheld the Board's application of the *Excelsior* standard against Wyman-Gordon. *Id.* at 766 (plurality opinion); *id.* at 769–75 (Black, J., concurring). The Court did so because application of *Excelsior* to Wyman-Gordon was lawful even if *Excelsior* itself was not. *Id.* at 766 (plurality opinion). The Court noted that "[b]ecause the Board in an adjudicatory proceeding directed [Wyman-Gordon] itself to furnish the list," the Board's decision was lawful. *Id.*

In its final installment, *NLRB v. Bell Aerospace Co.*, the Court again affirmed its position that an agency—and the Board in particular—has broad discretion to choose between adjudicating and rulemaking its policies, even when those policies materially change a longstanding position. 416 U.S. at 292–95. There, the Court addressed the Board's ability to classify categories of employees as nonmanagerial. *Id.* at 290–95. The Second Circuit had held that the Board was required to do so through notice-and-comment rulemaking because the Board's classification deviated from its prior precedent. *Id.* at 290. The Supreme Court unanimously rejected the Second Circuit's attempt to limit the Board's policymaking discretion. *Id.* at 290–95; *id.* at 295–96 (White, J., dissenting in part) (joining "the Court's opinion insofar as it holds that the Board was not required to resort to rulemaking in deciding this case"). The Court stated that it had already rejected the contention that the Board is "required to resort [] to

its rulemaking procedures if it desired to promulgate a new standard that would govern future conduct." *Id.* at 292 (majority opinion) (relying on *Chenery II*).

For those keeping score, all three cases sustained an agency's announcement of new principles through adjudication rather than rulemaking. And even *Wyman-Gordon*, probably the best case for the majority's position, upheld a Board decision relying on an order issued in violation of the APA's rulemaking requirements. The majority never adequately explains why we are not required to follow *Wyman-Gordon*, even assuming *Cemex* constitutes improper rulemaking.

In fact, before today, this court had no trouble following the tenets established in *Chenery II*, *Wyman-Gordon*, and *Bell Aerospace*. For example, in *Kindred Nursing Centers East, LLC v. NLRB*, we held that "the Board did not abuse its discretion in adopting a generally applicable rule through adjudication instead of rulemaking."[2] 727 F.3d 552, 565 (6th Cir. 2013); *see also R/T 182*, 519 F.3d at 310.

The majority reads these cases and sees a series of limitations on the Board's authority to adjudicate policy. My eyes see something totally different. These cases speak for themselves, and they all echo the same principle: the Board's policymaking playing field is massive, and it would have to throw the ball far afield to stumble out of bounds. True, the Court never eliminated the possibility that an agency could abuse its discretion to choose a policymaking vehicle, such as in *Excelsior*, where the Board adjudicated a policy that it did not apply to the employer before it. But *Cemex* is not *Excelsior*. Whether we like how the Board structured its *Cemex* decision or not, we should acknowledge that the Board did, in fact, apply the standard to Cemex.

**3.**

The majority further argues that the *Cemex* standard should have been developed through rulemaking because it is too general. According to the majority, the *Cemex* standard can be

---

[2]The majority complains that this court "disposed of th[e] challenge [in *Kindred Nursing*] without a detailed analysis, as the employer presented only a cursory argument." Maj. Op. at 19. The employer's argument there was no more cursory than Brown-Forman's argument here—Brown-Forman dedicates all of four pages over two briefs to its rulemaking-vs.-adjudication argument.

reduced to a simple formula: if an employer causes an election to be set aside, then it will be subject to a bargaining order.  But this overly simplistic construction fails to account for the many fact-bound decisions that inform the analysis.

*Cemex* did not create a one-size-fits-all standard.  Before the Board can order an employer to bargain under *Cemex*, it must consider several factors:

> [T]he nature, validity, and numerical strength of any nonelection showing of majority support for a union; the composition and appropriateness of any proposed bargaining unit; the nature and timing of any union claim to represent employees and any employer response; whether, when, and by whom a petition for a Board-supervised election has been filed; and the nature and impact of any employer unfair labor practices.

*Cemex*, 372 NLRB No. 157, slip op. at 4.  This fact-intensive inquiry shows that *Cemex* will not apply in every case where an employer commits unfair labor practices before a representation election.  Because these facts "vary widely depending on the company or industry," the Board "has reason to proceed with caution, developing [this] standard[] in a case-by-case manner with attention to the specific character of the" parties before it.  *Bell Aerospace*, 416 U.S. at 294.

The Board reasoned that its "application of the new standard to different facts in future cases will refine its contours in an evolutionary process that could not be achieved through notice-and-comment rulemaking."  *Cemex*, 372 NLRB No. 157, slip op. at 4.  We should give the Board's determination "great weight."  *Bell Aerospace*, 416 U.S. at 294.

That is what most courts do.  And that is why the majority does not point to a single case in which a court has struck down a policy adopted through adjudication on the ground that the policy is improper rulemaking.  The majority attributes courts' widespread hesitation to strike down the Board's adjudication-based policies as evidence of the Board's "typical respect for the statutorily imposed limitations on its authority."  Maj. Op. at 27.  The majority's newfound belief in the Board's respect for its limitations rewrites our own history of evaluating the Board's policies—this court has never been shy to hold that the Board traversed outside the bounds of its discretion in other contexts.  Just a few months ago, this court said that the Board exceeded its statutory authority when it awarded monetary damages to a Starbucks employee.  *NLRB v. Starbucks Corp.*, 159 F.4th 455, 459 (6th Cir. 2025).  Instead, the rarity with which courts

invalidate the Board's adjudication-based policies more accurately speaks to the breadth of its policymaking authority granted to the Board by Congress, which the Supreme Court has endorsed. *See Fibreboard*, 379 U.S. at 406.

**4.**

The majority also takes issue with the Board's reasoning. It asserts that the Board relied too much on its experience administering the NLRA and too little on the facts of the case before it. According to the majority, this resulted in a purely forward-looking policy, which should have been promulgated as a rule. But the majority fails to consider that the Board must rely on its experience to justify a change in its adjudicatory policy, and it neglects to acknowledge the Board's reliance on the facts in *Cemex*.

The Board accounted for several considerations when it adopted its new approach. Those considerations included its experience administering the NLRA, the congressional policies at stake, its decisions in other cases, changed circumstances in the field, and (contrary to the majority's arguments) "the facts of th[e] case" before it. *Cemex*, 372 NLRB No. 130, slip op. at 24–28.

The adoption of the new standard in *Cemex* arose from the General Counsel's request for the Board to overrule *Linden Lumber* and reinstate *Joy Silk*. The Board began its analysis by referencing the General Counsel's request for a new standard. *Id.* at 24. It strains reason to conclude that the Board acted without regard to the case in front of it when the parties themselves raised the issue in the first instance. An adjudication generally results from an agency's resolution of the arguments made by the parties before it. *R/T 182*, 519 F.3d at 310. The Board adjudicated the policy dispute presented by the parties based on the facts at issue and the arguments made.

In addition to the facts of the case, the Board properly relied on its experience. It is permitted "to draw on experience in factual inquiries." *Radio Officers' Union of Com. Telegraphers v. NLRB*, 347 U.S. 17, 49 (1954). Congress created the Board so that decisions about the NLRA would be "made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." *Int'l Union of Elec.,*

*Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 674 (1961) (quotation omitted).  The Board is supposed to "modif[y] and reform[] its standards on the basis of cumulating experience." *Id.*  Its "cumulative experience" in administering the NLRA "begets understanding and insight by which [its] judgments are validated or qualified or invalidated." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975) (citation modified).  To that end, the Board is permitted to more freely apply a remedy if it appears that a more generous "invocation of the rule will best serve congressional policy." *Atchison, Topeka & Sante Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion).

This "constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process." *J. Weingarten*, 420 U.S. at 266 (quotation omitted).  This court has recognized this principle—we enforced the Board's decision to adjudicate policy even where it solicited briefs from the public and relied on that outside input.  *Kindred Nursing*, 727 F.3d at 565.

The Board did not err in providing "a reasoned analysis" for its change in position before applying its new standard to the case facts.  *Fox Television*, 556 U.S. at 514 (quotation omitted).  Had the Board applied a new standard before providing its reasons for changing the standard, an argument could be made that the Board did not give reasoned explanation for the change.

To reiterate, the Board is required to show its work.  There is a presumption that an agency will carry out the policies to which it has committed itself.  *Atchison*, 412 U.S. at 808; *see also Wyman-Gordon*, 394 U.S. at 765–66.  And "[f]rom this presumption flows the agency's duty to explain its departure from prior norms." *Atchison*, 412 U.S. at 808.  The agency's basis for the change "must be set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196.  "A reviewing court must be able to discern in the [agency's] actions the policy it is now pursuing" so that it can decide whether the agency's "policies are consistent with its mandate from Congress." *Atchison*, 412 U.S. at 805–06.

The majority's concern about the future applicability of the *Cemex* standard is also misplaced.  Of course, the *Cemex* standard applies to future cases before the Board—that is how

the Board's precedents have always worked. The Board's policies and principles created through adjudication must have prospective effects. *Wyman-Gordon*, 394 U.S. at 765–66. They provide "a guide to action that the agency may be expected to take in future cases." *Id.* Indeed, the parties should presume that an agency will act consistently with its precedent. *Atchison*, 412 U.S. at 808. But just because adjudications affect future parties does not mean that the Board must engage in formal rulemaking. *See R/T 182*, 519 F.3d at 310; *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013). Such a requirement would "misconceive the nature of administrative decisionmaking." *J. Weingarten*, 420 U.S. at 465–66.

The question is not whether agency action will govern a large number of future cases— that "carries little weight in deciding whether it is a rule or an order." *ItServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (citation modified). Instead, the key to distinguishing between a rule and an order is determining whether the agency applied the underlying policy to the parties to the adjudication. *Wyman-Gordon*, 394 U.S. at 765–66.

The Board applied the new *Cemex* standard to the employer in the same case in which it adopted that standard. True, as the majority mentions, *Cemex* discussed the need for the new standard in a separate section of its order than when it applied the standard. But I fail to see a problem with this approach. The order in which the Board created or applied the standard has no legal significance—the legal significance lies in the application of the new standard such that a reviewing court could sustain a bargaining order based on it.

At the end of the day, the Board did not have to resort to rulemaking when adopting its new standard because the new standard did not have only prospective effect. As the majority acknowledges, the Board devoted a section of its decision to applying the new standard to Cemex. *Cemex*, 372 NLRB No. 130, slip op. at 29–30.

\*     \*     \*

Congress gave the Board broad discretion to choose how to create its policies. The Board chose to adjudicate a new standard to govern the issuance of a bargaining order for a violation of § 8(a)(5) of the NLRA. The Board did so in an adjudicative proceeding at the request of the parties before it and in response to the facts of the case. It properly considered the competing

policies at issue and its experience in administering the NLRA.  Its adjudication of this policy change is consistent with its adjudication-based evolution of this standard.  *See, e.g.*, *Joy Silk*, 85 NLRB at 1264; *Snow & Sons*, 134 NLRB at 710–11; *Aaron Bros.*, 158 NLRB at 1079; *Gissel*, 395 U.S. at 594; *Linden Lumber*, 190 NLRB at 720–21.

This is how agency adjudication works: case-by-case development of complex, fact-bound determinations.  I would therefore uphold the Board's decision as a proper exercise of its policymaking authority.

**B.**

*Cemex* operates within the guideposts established in *Gissel* for the issuance of remedial bargaining orders.  In *Gissel*, the Supreme Court approved the Board's use of a bargaining order in two situations: (1) "in exceptional cases marked by outrageous and pervasive unfair labor practices," and (2) "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes."  395 U.S. at 613–14 (citation modified).  The Court reasoned that the Board "should issue" a bargaining order in either of these circumstances.  *Id.* at 614–15.  The only limitation *Gissel* established was that the Board could not issue a remedial bargaining order for "minor or less extensive unfair labor practices" that have "minimal impact on the election machinery."  *Id.* at 615.

Brown-Forman argues that *Cemex* conflicts with *Gissel* because, under *Cemex*, the "occurrence of a single unfair labor practice, no matter how minor or technical, in the lead up to the election will result in the issuance of a bargaining order."  D. 27 at p.35.  *Cemex* says otherwise.

The *Cemex* standard, "consistent with *Gissel*, appropriately focuses on the question of whether an employer's unlawful coercive misconduct has so undermined the reliability of the election as an indicator of employees' free choice that a prior nonelection showing becomes the more reliable indicator."  *Cemex*, 372 NLRB No. 130, slip op. at 37.  The Board rejected the view that its new standard required "a bargaining order as 'the first and only option' whenever an

employer commits any unfair labor practice . . . prior to an election, no matter how attenuated the impact of the employer's conduct upon the validity of the election." *Id.*

As in *Gissel*, the Board still considers "all relevant factors, including the number of violations, their severity, the extent of dissemination, the size of the unit, the closeness of the election (if one is held), the proximity of the misconduct to the election date, and the number of unit employees affected." *Cemex*, 372 NLRB No. 130, slip op. at 37. In applying these factors, the Board's Division of Judges has refused to issue a *Cemex* bargaining order when the unfair labor practices are too "isolated and minimal" to sustain one. *See Yapp USA Auto. Sys., Inc.*, JD-52-25, 2025 WL 1662496 (NLRB Div. of Judges June 11, 2025).

Brown-Forman also argues that because the Board took a different position than the one it advocated for in *Gissel*, the *Cemex* decision is necessarily inconsistent with *Gissel*. I disagree.

The *Gissel* standard required the Board to determine whether alternative remedies—such as a rerun election or cease-and-desist order—could cure the unfair labor practices before it decided that a bargaining order was the appropriate remedy. *Gissel*, 395 U.S. at 613–14. *Cemex* affects this analysis in only two ways. First, it establishes as a matter of policy that the possibility of erasing the effects of unfair labor practices and ensuring a fair election or rerun election is always slight when the employer's unlawful conduct is pervasive enough to undermine the results of the election. *Cemex*, 372 NLRB No. 130, slip op. at 25. And second, in establishing that element of a *Gissel* bargaining order as a matter of policy, *Cemex* shifted the focus away from the effects of an employer's past misconduct on a future election. *Id.* None of this brings *Cemex* outside the bounds the Court identified in *Gissel*.

Look at the Board's reasoning. *Cemex* codifies the Supreme Court's recognition that the Board need not move forward with a rerun election when the employer committed unfair labor practices that "destroy[ed] the laboratory conditions necessary for a fair election." *Gissel*, 395 U.S. at 612. The Court reasoned that "[t]he damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign." *Id.* Relying on its expertise, the Board decided that a bargaining order is the only fair way to effectuate employee rights under the NLRA when an

employer destroys the laboratory conditions of an election—alternative remedies would not be effective. *Cemex*, 372 NLRB No. 130, slip op. at 28.

Consider the unfair labor practices here. Brown-Forman gave its employees substantial wage increases, better benefits, and bottles of bourbon in the runup to the representation election. It is hard to see how the Board's other remedies can cure those violations of the NLRA. The Board cannot take those benefits away, and a cease-and-desist order has no effect here—the damage has already been done. Brown-Forman effectively dissipated Woodford workers' majority support for the Union. The bargaining order remedies this "past election damage" where a traditional remedy would not. *Gissel*, 395 U.S. at 612.

*Gissel* does not bar the use of a remedial bargaining order under these circumstances. Brown-Forman's unfair labor practices were not minor. Its practices fall squarely within the two categories of unfair labor practices for which a bargaining order "should issue." *Id.* at 615.

And contrary to Brown-Forman's assertions, elections remain the preferred method of ascertaining majority status under *Cemex*. 372 NLRB No. 130, slip op. at 28 n.152. But as the Supreme Court observed, the NLRA does not give employers "an absolute right to an election at any time." *Gissel*, 395 U.S. at 599. Instead, Congress "intended . . . to allow them, after being asked to bargain, to test out their doubts as to a union's majority in a secret election which they would then presumably not cause to be set aside by illegal antiunion activity." *Id.*

*Cemex* simply stands for the well-settled proposition that an "election necessarily fails to reflect the uncoerced choice of a majority of employees" when "the employer commits unfair labor practices that invalidate the election." *Cemex*, 372 NLRB No. 130, slip op. at 25. This is not a new principle. *See Linden Lumber*, 419 U.S. at 303–04 (recognizing that *Gissel* "held that an employer who engages in 'unfair' labor practices 'likely to destroy the union's majority and seriously impede the election' may not insist that before it bargains the union get a secret ballot election" (quoting *Gissel*, 395 U.S. at 600)).

The Board did not abuse its discretion in creating the *Cemex* standard despite the Court's approval of a different standard in *Gissel*. And its reasons for changing its policy were rational. *See Fox Television*, 556 U.S. at 517.

**C.**

The Board also did not err by applying *Cemex* retroactively.  Retroactivity is "not necessarily fatal to [a new principle's] validity." *Chenery II*, 332 U.S. at 203.  The Board has "wide discretion to determine whether and to what extent [a] new rule will be applied retroactively." *Fox Painting Co. v. NLRB*, 919 F.2d 53, 56 (6th Cir. 1990).  The Board acts within its discretionary authority unless the employer can show "manifest injustice." *Id.* (quotation omitted).

To determine whether it would be manifestly unjust to apply a new rule retroactively, we weigh three factors: "(1) the reliance of the parties on preexisting law; (2) the effect of retroactivity on accomplishing the purpose of the law; and (3) any injustice arising from retroactive application." *Id.*  These factors help us balance "the relative weight of the burden that retroactivity would entail" against "the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *Id.* (quoting *Chenery II*, 332 U.S. at 203). "If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *Chenery II*, 332 U.S. at 203.

The factors favor applying *Cemex* retroactively.  Brown-Forman has not shown that it relied to its detriment on a pre-*Cemex* standard.  Brown-Forman had no previously existing right to commit unfair labor practices.  It cannot credibly suggest that it committed the unfair labor practices at issue based on its understanding that its conduct would not result in a bargaining order.  Applying *Cemex* retroactively also accords with the Board's duty to remedy unfair labor practices.  And there is no injustice to Brown-Forman from the Board imposing a *Cemex* bargaining order.  Thus, the weight of the burden that retroactivity would entail is nearly nonexistent.

Brown-Forman argues that it relied to its detriment on the Board's past policy—*Linden Lumber*—when it refused to bargain with the Union.  But the Board did not issue a *Cemex* bargaining order because Brown-Forman waited to bargain until after the election—it ordered Brown-Forman to bargain because the company committed a series of unfair labor practices that negated the possibility of a fair election.  Though the standard for issuing the bargaining order

has changed, the principle has remained the same: an employer cannot act with the intent to discourage unionization. *Gissel* established that 50 years ago. The Board's imposition of "a more severe remedy for conduct already prohibited" should not raise a court's "judicial hackles." *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966) (Friendly, J.).

Now consider the mischief to the NLRA if Brown-Forman escapes an appropriate remedy for its unfair labor practices. The workers' right to choose a collective representative would be buried. And Brown-Forman gets rewarded for its campaign to subvert their rights. This is not the kind of result contemplated by the NLRA.

**V.**

The majority seeks to rein in the Board's policymaking authority, but that job does not belong to this court. Congress gave the Board the power to make policy through adjudication, and the Supreme Court has blessed Congress's decision. Because the Board properly exercised that power within the broad statutory limits imposed by the NLRA and the APA, I would deny Brown-Forman's petition for review and enforce the Board's decision and order.